# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                                    NEWS RELEASE #063

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **9th day of December, 2014**, are as follows:

**VICTORY, J.**

2013-K -2007        STATE OF LOUISIANA v. DANIEL MARSHALL (Parish of Orleans)
                    (Manslaughter)

                    For the reasons stated herein, the judgment of the court of
                    appeal and the defendant's conviction and sentence for
                    manslaughter are reinstated.
                    REVERSED; CONVICTION AND SENTENCE REINSTATED.

# SUPREME COURT OF LOUISIANA

## NO. 2013-K-2007

### *STATE OF LOUISIANA*

### *VERSUS*

### *DANIEL MARSHALL*

## ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, FOURTH CIRCUIT, PARISH OF ORLEANS

**VICTORY, J.**

Following defendant's second degree murder trial and his conviction and sentence for the lesser verdict of manslaughter, the Fourth Circuit Court of Appeal vacated defendant's conviction and sentence upon finding that the prosecutor's use of defendant's post-arrest silence, in violation of ***Doyle v. Ohio***, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), was not harmless because it undercut his plausible self-defense claim. We granted the State's writ application, and, after reviewing the record and the applicable law, reverse the judgment of the court of appeal and reinstate defendant's conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

On the evening of September 25, 2009, defendant, Daniel Marshall, ended a love triangle by repeatedly shooting Ronald Hodges, Jr., as Hodges jumped off the porch of a residence on South Scott Street in New Orleans and came toward him. The residence belonged to Ebony Gastinell, the mother of his three children. In all, Hodges sustained five gunshot wounds–two to the back–and projectile fragment abrasions on his right shoulder, arm and hand. The police found nine spent casings fired by a .40 caliber handgun scattered on the ground but did not find any firearms discarded on the scene.

Hodges had been in a romantic relationship with Gastinell for several years, and fathered her three children. He had been separated from her for six months while serving a sentence on a drug conviction before his release in September 2009. During that time, Gastinell began a relationship with defendant, and he sometimes stayed at her residence. After Hodges returned from jail, Gastinell lied to him when he confronted her about her relationship with defendant, as revealed to him by his children living in the house. Gastinell stopped seeing or talking to defendant in that week as she attempted to repair her relationship with Hodges.

On the night of the shooting, Hodges arrived at Gastinell's residence to unclog a toilet. While he was there, defendant knocked on the back door. Gastinell told him to leave. About thirty minutes later, defendant came back and knocked on the front door. Gastinell went out to the front porch and again told defendant to leave, explaining that she was trying to work things out with Hodges. She heard her mother Sandra tell Hodges she wanted to bring him home and then Sandra walked outside to her car. At that time, defendant backed up and stood by the gate in the front yard. Hodges then came out the front door and saw the defendant standing there. Instead of walking down the steps, Hodges jumped off the porch with his hands in the air and rushed at defendant, despite Gastinell's attempt to restrain him. Hodges was nearly six feet tall and weighed over 200 pounds. The much smaller defendant (5'6" and 140 pounds) responded by pulling out his gun and opening fire. Gastinell described the incident as follows:

> As [Hodges] came . . . out of the house, he saw [defendant] standing right there. And [defendant] was just staring . . . like he had something on his mind. So when [Hodges] . . . saw him standing over there, he just jumped off the porch and he raised his hands up and he was like, . . . "Say, Homie, I'm not even tripping. I ain't even tripping." And that's when [defendant] just came off his hip with the gun and cocked it and started shooting. There was no altercation,

2

there was no nothing. They never passed words. They never even bumped heads, never.

Gastinell testified that defendant continued to fire even after Hodges, who had turned and tried to run when the shooting began, collapsed on the ground. Sandra Gastinell testified that after Hodges turned and attempted to run, he sustained two bullet wounds to his back and fell to the ground, at which point defendant stood over the prostrate victim and "kept on shooting and kept on shooting." When he finished, he took off running. Sandra got into her car and pursued him as defendant ran down the street and jumped a fence. When Sandra yelled after him to ask why he had shot Hodges, defendant exclaimed, "Because I told fool not to tell me nothing," and then went over the fence. His arrest followed four days later when he surrendered to the police after Gastinell and her mother identified him in a photographic lineup, and a warrant issued for his arrest.

Police testimony established that nine spent casings, all from a .40 caliber semi-automatic pistol, together with bullets fragments, were found in close proximity to the victim's body lying in the driveway of Gastinell's home near the sidewalk. The coroner testified that Hodges had been shot a total of five times. One bullet entered the left side of his face and exited through the right side. Another entered the back of the victim's left hand and exited through his palm Another entered his right upper arm near the bicep and lodged in his arm. Another entered his back left shoulder, cut through a major artery in the neck, and lodged in the left side of his chest. The coroner testified this shot was the primary cause of death. The final bullet entered the victim's back and passed through the spinal column before lodging in his torso. The coroner also testified that fragment abrasions sustained by the victim on his right side had been caused by a bullet or

3

bullets breaking up after striking a hard surface, such as wood, cement, or metal, close to the body. Viewing a photograph of the victim lying sprawled on the ground, the coroner concluded that the fragment injuries appeared to have been caused by a bullet hitting either the cement of the driveway or the nearby ground. The bullet wound to the victim's face was also consistent with the victim lying on the ground when he was shot. Notably, the coroner had found blood smeared on the palm of the victim's right hand, the same hand in which defendant claimed Hodges held a gun as he came off Gasinell's porch.

Defendant took the stand and told jurors he shot Hodges in self-defense as the victim rushed at him in a jealous rage with a revolver held in his right hand. Defendant testified he dropped his own gun in a panic as he fled the scene after shooting Hodges, although he normally carried it with him at all times for protection. Defendant further claimed that he knew Hodges had access to firearms stashed in the residence because he had stayed there and saw a small revolver that belonged to Sandra Gastinell. Defendant was uncertain whether Hodges fired his own gun, but he was sure that he did not stand over the victim and continue to shoot Hodges while he lay on the ground. On cross-examination, the state confronted defendant with his failure to stay on the scene and explain to the police that he shot Hodges in self-defense. The state also confronted defendant with his failure to give his self-defense account to the police following his arrest and receipt of his *Miranda* warnings, although he had four days in which to cool off and consider his options before surrendering to the authorities. Over defense counsel's repeated objections, the state challenged defendant as follows:

4

Q. All right. So you had four days to think about what happened, and you decided to do the right thing and turn yourself in, right?
A. Yes, ma'am.
Q. Cool down a little bit, correct?
A. Yes, ma'am.
Q. All right. So you turn yourself in. You go to the police. At that point, did you go to the detective and say, wait, let me tell you what happened . . . . this was a misunderstanding . . . . Did you tell them what happened, Mr. Marshall?
A. No, ma'am.
Q. In fact, you invoked you right to remain silent.
A. Yes, ma'am.
Q. And you haven't talked to anybody for the past two years and told them it was self-defense, correct?

Only at that point did the trial court sustain counsel's objection to the state's line of cross-examination. The state also referred to his post-*Miranda* silence during closing arguments as one circumstance among others, principally forensic evidence provided by the pathologist in the coroner's office with respect to the number and placement of the gunshot wounds sustained by the victim, that contradicted his claim of self-defense. The prosecutor pointedly asked jurors:

> And what else does he say that also doesn't support their self-defense theory? That he had four days to think about this and he wanted to all of a sudden do the right thing and turn himself in. Well, there was a warrant out for his arrest, so he kind of had to. He turns himself in. he had four days to cool down, but still doesn't want to talk to the detectives. He still doesn't want . . . to tell them that he didn't do this."

The court overruled defense counsel's objection to the state's cross-examination of defendant about his post-arrest silence and counsel's mistrial motion during closing argument when the state addressed the significance of that silence for defendant's claim of self-defense at trial. Following the jury's return of a lesser verdict of manslaughter on the original charge of second degree murder, the court sentenced defendant to 40 years imprisonment at hard labor.

5

On appeal, the court of appeal indicated the state conceded that the prosecutor violated **Doyle**, *supra*, by cross-examining defendant with respect to his post-arrest, post-**Miranda** silence, and then arguing to jurors that defendant's silence amounted to an admission his claim of self-defense at trial was spurious; therefore, only the question of whether the error required reversal of defendant's conviction and sentence appeared at stake.[1] After reviewing the evidence, a majority on the court of appeal panel concluded that even without considering defendant's claim Hodges had a gun in his hand when he sprang off Gastinell's porch and came at him, "a review of the facts makes Mr. Marshall's self-defense claim at least plausible." **State v. Marshall**, 12-0650 (La. App. 4 Cir. 7/31/13), 120 So.3d 922, 931. The court noted that the cross-examination of Ebony Gastinell established that she had testified before the grand jury with respect to information she had received from other persons that Hodges had gone looking for defendant on at least two prior occasions after learning of his relationship with Gastinell. Further, the evidence also established that Gastinell attempted to restrain the much larger Hodges from exiting the house and that he then jumped off of the porch in the direction of the much smaller defendant. Given all of that, the majority concluded that "[b]ecause the prosecution's conduct resulted in a violation of Mr. Marshall's constitutional rights under **Doyle** and **Miranda**, and his exculpatory claim of self-defense was plausible from the facts in the record, we cannot find that the trial error [was] harmless or, stated another way, that the verdict is *surely* unattributable to the error." **Id**.

---

[1]While the state now contends it did not concede to a **Doyle** violation, for purposes of our analysis, we will presume that a **Doyle** violation did occur.

6

Dissenting, Judge Dysart underscored the forensic evidence indicating that defendant moved closer to Hodges as he fired his weapon, ultimately standing over him as he emptied his pistol. The eyewitness testimony of Ebony and Sandra Gastinell corroborated what the physical evidence depicted. Thus, while the prosecutor's unfair use of defendant's post-*Miranda* silence to impeach his trial testimony may have influenced jurors to question his credibility, "the overwhelming physical evidence render[ed] the improper questioning harmless." *Marshall*, 120 So.3d at 932 (Dysart, J., dissenting).

We granted the state's writ application to consider whether this *Doyle* violation constituted harmless error. *State v. Marshall*, 13-2007 (La. 4/25/14), 138 So. 3d 634.

## DISCUSSION

In *Doyle*, the United States Supreme Court held that a defendant's right to due process is violated when a prosecutor impeaches a defendant's exculpatory story, told for the first time at trial, by cross-examining him about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest. *Doyle, supra*, 426 U.S. at 619, 96 S.Ct. at 2245. Use of a defendant's post-arrest silence in such manner violates due process. *Id.*

A *Doyle* violation is characterized as a trial error which is subject to a harmless error analysis. *Id.* (reversing defendant's conviction upon finding that "the State has not claimed that such use in the circumstances of this case might have been harmless error"); *State v. Patterson*, 12-464 (La. 7/2/12), 92 So. 3d 338 (reversing defendant's conviction upon finding the *Doyle* violation was not harmless error). The Supreme Court's seminal harmless-error decision involved prosecutorial comment on a defendant's assertion at trial of his Fifth Amendment

7

privilege. *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967). As explicated by the Court's later decision in *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993), the question *Chapman* instructs reviewing courts to consider is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." The *Sullivan* formulation of harmless-error explicitly drew on the Court's prior decision in *Yates v. Evatt*, 500 U.S. 391, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991), which posed as the first step in the analysis a determination of "what evidence the jury actually considered in reaching its verdict," and then framed the question for a reviewing court to answer in conducting harmless-error review as follows:

> To say that an error did not 'contribute' to the ensuing verdict is not, of course, to say that the jury was totally unaware of that feature of the trial later held to have been erroneous. . . . To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.

*Yates*, 500 U.S. at 403-04, 111 S.Ct. at 1893.

The record does not reflect whether defendant was ever actually advised of his right to remain silent at the time of his arrest. However, assuming normal protocol ensued, and considering the state's concession before the court of appeal that a *Doyle* violation occurred, there can be no real dispute that a violation of *Doyle* did occur. Therefore, we will analyze all the evidence before the jury to determine whether this error was harmless.

In *Patterson, supra*, we found a *Doyle* violation was not harmless because the circumstances of the case "essentially pitted the victim's word against the

8

defendant's with little or no corroboration on either side." 92 So. 3d at 338. This is not such a case. As stated above, here the forensic evidence showed the victim was shot five times, twice in the back, and that a bullet or bullets fired close to his prone body struck the cement beside him and caused the fragment abrasions Hodges sustained on his right side. This forensic evidence was clearly inconsistent with any reasonable claim of self-defense but entirely consistent with the eyewitness accounts given by Ebony and Sandra Gastinell. Ebony testified that when the victim charged off the porch with his hands raised as he exclaimed, "Say, Homie, I'm not even tripping," defendant simply pulled out his gun and began firing, and continued firing even after Hodges had fallen to the ground. Sandra testified that after Hodges turned and attempted to run, he sustained two bullet wounds to his back and fell to the ground, at which point defendant stood over the prostrate victim and "kept on shooting and kept on shooting." After Sandra chased him in her car and yelled after him to ask why he had shot Hodges, defendant exclaimed, "Because I told fool not to tell me nothing," and then went over the fence.

The forensic and eyewitness testimony which provided a consistent account of how Hodges died, and which clearly demonstrated that defendant shot five times at close range, twice in the back, truly undermined defendant's self-defense claim. There was no evidence corroborating defendant's claim Hodges had been armed– no gun was found and no eyewitness, other than defendant, said the victim had a gun. In fact, the coroner's report explicitly stated that there was "[s]meared blood on the palm of the [victim's] hand," refuting the defense contention that the victim's palm was clean because he had been holding a weapon. Assuming the jury found Hodges was unarmed, it is conceivable that rational jurors might have

9

found that defendant, the much smaller man, was initially justified in evening the odds by pulling out his gun when Hodges charged at him with his hands raised. However, defendant nevertheless continued to fire even after Hodges collapsed on the ground defenseless, and it was then that the fatal wound through his left shoulder severing his carotid artery occurred. As the prosecutor argued to jurors at the close of the case, the only hard surface against which one of the bullets fired by defendant could shatter in close proximity to the victim's body was the driveway or ground underneath him. Further, the victim sustained two gunshot wounds to his back. This forensic evidence would make any finding of self-defense irrational. Moreover, defendant told Sandra Gastinell that he shot defendant, not in self-defense, but "[b]ecause I told fool not to tell me nothing."

Finally, what hurt defendant's credibility was not the prosecutor's exploitation of his post-*Miranda* silence to suggest that his claim of self-defense was a recent fabrication, but defendant's own criminal past, which revealed two prior convictions for possession of cocaine and one felony conviction for second offense marijuana. Defendant was in the process of committing his fourth felony, carrying a concealed weapon as a previously convicted felon, while on probation for his third offense, when he pulled out his .40 caliber semi-automatic and opened fire. Further, while the state violated *Doyle* by questioning defendant about his post-arrest failure to tell his story of self-defense, the state also validly asked defendant why he did not wait at the Gastinell home following the shooting and tell the police that he had shot the victim in self-defense. Thus, defendant's failure to claim self-defense until trial was already before the jury, in spite of the later *Doyle* violation. With overwhelming evidence on one side and with a totally implausible self-defense claim offered by a three-time felony offender on the other,

the prosecutor's *Doyle* violation was unquestionably harmless, as jurors would surely have reached the inevitable guilty verdict that followed.

## CONCLUSION

A defendant's due process rights are violated when a prosecutor impeaches a defendant's exculpatory story, told for the first time at trial, by cross-examining him about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest. That is what occurred in this case when the state cross-examined defendant with respect to his post-arrest, post-*Miranda* failure to tell police that he killed Hodges in self-defense and then argued to jurors that defendant's silence amounted to an admission that his claim of self-defense at trial was spurious. This *Doyle* violation is subject to a harmless error analysis whereby we consider whether the guilty verdict at trial was surely unattributable to the error. Considering all of the other evidence the jurors had before them, specifically the forensic evidence and eyewitness testimony that completely undermined the credibility of defendant's self-defense claim argument, we find the *Doyle* violation was harmless when weighed against everything else presented to the jury. Based on the evidence presented at trial, the jury clearly rejected defendant's claim of self-defense and returned a manslaughter verdict in what amounted to a classic love triangle pitting two men, mismatched in size and weight but also in firepower, in a fight over a woman.

## DECREE

For the reasons stated herein, the judgment of the court of appeal and the defendant's conviction and sentence for manslaughter are reinstated.

**REVERSED; CONVICTION AND SENTENCE REINSTATED.**