GARRETT, J.
[Jn this out-of-time appeal,- the defendant, Orlando Mansfield, contends that his trial counsel was ineffective for failing to object to the prosecutor’s repeated Doyle[1] Violations during, his cross-examination in his jury trial held in 2013. For the reasons expressed below, we remand the matter to the trial court for a contradictory hearing at which-the ineffective assistance claim can be fully litigated. -
FACTS
On Sunday, November 21, 2010, Ida Hall reported to the police that she had-been attacked at her, Bastrop home by a man wielding-a metal pipe. She said that, while sitting in her carport, she observed a man she did not know at the edge of her house. He picked up a metal pipe lying on the ground, and approached the steps leading up to her carport. She was standing at the top of the steps. He struck her on the legs with the. pipe several times. Sh.e lunged at him, forcing him to step back on the ground. She then ran inside the house. When he tried to put the pipe in the doorway to prevent her from pulling her storm door shut, she pushed the pipe away and locked the door. The man fled, and she called the police. She described the assailant as a teenage blapk male wearing a navy blue hooded sweater and blue jeans.
*325 On Tuesday, November 23, 2010, Laura May, Ms. Hall’s daughter, called the police to report that she had seen someone on the train tracks near her mother’s house. Due to the distance, she was unable to see the. person’s facial features. The person was wearing a faded blue hoodie with the hood 12up, covering his hair; he waved at her. Believing that this person matched the description of her mother’s assailant, she called 911 immediately. However, no one was apprehended that day.
On Wednesday, November 24, 2010, Ms. May called the police to report that she had observed a black male in her mother’s carport. When she saw him, he was about 10 feet from her.' He was dressed in a shirt and a pair of pants; he was not wearing a hoodie. She described him as having a medium complexion and unkempt hair that was about two inches long. He ran away.
Det. Mitchell Jeselink of the Morehouse Parish Sheriffs Office was in charge of the investigation. As the result of a tip from a confidential informant, he developed the defendant as a suspect. He presented what he described as a four-person photo lineup to Ms. Hall and Ms. May. However, as will be explained below, the photos were not presented in a customary lineup format, as they consisted' of four separate pictures containing identifying information. Ms. Hall identified the defendant’s photo as the man who assaulted her, while Ms. May picked out his photo' as the man she saw in the carport several days after her mother’s attack.
■Det. Jeselink arrested the 22-year-old defendant at his mother’s house on November 24, 2010.[2] Without obtaining a search warrant, he seized a blue hoodie from the residence. This hoodie had the “Adidas”: logo, on the front, although a hoodie,-with an “Adidas” logo had never been described by Neither Ms: Hall or Ms, May. Ms. Hall subsequently identified it as the one, worn-by her assailant when it was shown to her by the detective..
The defendant was arrested on charges of aggravated battery and attempted aggravated burglary. He was-later charged by bill of information with aggravated battery, aggravated burglary, and attempted unauthorized entry oft an inhabited dwelling.[3] The third charge was. subsequently declined by.the state,-.and the. .defendant was tried before a jury on the aggravated battery and aggravated-burglary- charges in September 2013-[4] • <
At trial, Ms. Hall and Ms. May positively identified the defendant. The defendant testified on his own béhalf and denied committing the offenses! During his cross-examination of the defendant, the -prosecutor made several references to the defendant’s post-Miranda silence without any objection by defense-counsel. , The jury acquitted the defendant on the aggravated battery, charge and returned a responsive verdict of guilty of simple burglary of an inhabited dwelling on the aggravated burglary charge.
The state filed a habitual offender bill of information, asserting that the defendant *326 had a prior felony conviction for simple arson. The trial court adjudicated the defendant as a second felony offender. In January 2014, the defendant was sentenced to nine years at hard labor with credit for time served, with the first year of the sentence to be served without benefit of | ¿parole, probation or suspension of sentence. The trial court ordered that the sentence run consecutively to any parole revocation. No timely motion for appeal was filed on the defendant’s behalf at that time.
In April 2015, the defendant filed a pro se motion for production, seeking documents in order to file' a post-conviction relief (“PCR”) application. One of the proposed grounds for PCR relief set forth in the motion was ineffective assistance of counsel. On May 1,-2015, the trial court signed an order of appeal and for appointment of counsel in which it stated that it accepted and treated the defendant’s pro se motion for production of documents as a motion for appeal.and appointment of appellate counsel. It appointed the.Appellate Project to represent the defendant on appeal.
This appeal followed. The sole assignment of error urged is that trial counsel was ineffective because, during the defendant’s cross-examination, he failed to object or request a mistrial in response to the prosecutor’s repeated references to the defendant’s post-Miranda silence.
LAW
Doyle Violations
In Doyle v. Ohio, supra, the United States Supreme Court held that the use for impeachment purposes of the defendant’s silence at the time of arrest and after receiving Miranda warnings violates the Due Process Clause of the Fourteenth Amendment. The decision in Doyle rests on the premise that Miranda warnings render the subsequent silence of the defendant “insolubly ambiguous,” and thereby make later use of that silence | fito impeach his or her exculpatory testimony at trial fundamentally unfair. State v. Richards, 99-0067 (La.9/17/99), 750 So.2d 940; State v. Grant, 47,365 (La.App.2d Cir.9/20/12), 105 So.3d 81, writ denied, 2012-2279 (La.4/5/13), 110 So.3d 1073.
A defendant’s due process rights are- violated when a prosecutor impeaches a defendant’s exculpatory story, told for the first time at trial, by cross-examining him about his failure to have told the story after receiving Miranda warnings at the time of his arrest. State v. Marshall, 2013-2007 (La.12/9/14), 157 So.3d 563.
The Doyle proscription against referring to a defendant’s post-arrest silence is not without exceptions. The state is allowed to reference the defendant’s post-arrest silence when the evidence of post-arrest silence is relevant to rebut a defense-raised assertion that the arresting officers failed to properly investigate or that the defendant actively ..cooperated with the police when arrested. State v. Bell, 446 So.2d 1191 (La.1984); State v. Harrison, 46,325 (La.App.2d Cir.5/18/11), 69 So.3d 581.
A Doyle violation is characterized as a trial error which is subject to a harmless error analysis. The harmless error inquiry is “whether the guilty verdict actually rendered in this trial was surely unattributable to the error.” State v. Marshall, supra, State v. Harrison, supra. A Doyle violation that is not harmless under this harmless error test constitutes reversible error. State v. Langston, 43,923 (La.App.2d Cir.2/25/09), 3 So.3d 707, writ denied, 2009-0696 (La.12/11/09), 23 So.3d 912.
*327 | i;In State v. Patterson, 2012-0464 (La.7/2/12), 92 So.3d 338, the defendant was charged with aggravated battery, and a jury found him guilty of second degree battery. It was a case that “essentially pitted the victim’s word against defendant’s with little or no corroboration on either side.” The Louisiana Supreme Court found the Doyle violation in Patterson was not harmless, because it did not find the defendant’s exculpatory account so implausible that the state carried its burden of proving that the Doyle violation did not contribute to the jury’s verdict.
In State v. Marshall, supra, the defendant was charged with second degree murder, and a jury convicted him of manslaughter. The Louisiana. Supreme Court found that this case was distinguishable from Patterson due to the overwhelming amount of eviclence presented by the state to undermine the defendant’s claim of self-defense. The forensic evidence showed that the defendant shot the. victim five times, including twice in the back, and that the bullets fired close to the victim’s body struck the cement, indicating that the victim was on the ground when he was shot. The forensic evidence was consistent with the eyewitness accounts, and there was no evidence that corroborated the defendant’s claim that the victim was armed. The Louisiana Supreme Court concluded that “[w]ith overwhelming evidence on one side and with a totally implausible self-defense claim offered by a three-time felony offender on the other, the prosecutor’s Doyle violation was unquestionably harmless.”

ItIneffective Assistance of Counsel

Both the Louisiana arid federal constitutions guarantee a criminal defendant’s right to the effective assistance of counsel. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); State v. Brooks, 94-2438 (La.10/16/95), 661 So.2d 1333. When a defendant seeks reversal of a conviction-based on ineffective assistance of counsel, he must establish two separate elements to succeed. First, the defendant must’show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
Second, the defendant must show that the deficient performance ’ prejudiced the defense. This requires showing that counsel’s'errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. It is not sufficient for the defendant to show the error had some conceivable effect on the outcome of the proceedings. Rather, he must show that, but for counsel’s ‘unprofessional errors, there is a reasonable probability the outcome of the trial would have been different; Strickland v. Washington, supra; State v. Moran, 47,804 (La.App.2d Cir.4/10/13), 135 So.3d 677, writ denied, 2013-1052 (La.11/15/13), 125 So.3d 1101.
An assessment of an attorney’s performance requires his conduct to be evaluated from counsel’s perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel’s -judgment, tactical decisions, and trial strategy, strongly presuming he has exercised treasonable professional judgment. State v. Moore, 48,769 (La.App.2d Cir.2/26/14), 134 So.3d 1265, writ denied, 2014-0559 (La.10/24/14), 151 So.3d 598.
Generally, -a claim of ineffective assistance of counsel is properly raised in an application for PCR in the trial , court. State ex rel. Bailey v. City of West Monroe, 418 So.2d 570 (La.1982); State v. Ellis, 42,520 (La.App.2d Cir.9/26/07), 966 So.2d 139, writ denied, 2007-2190 *328 (La.4/4/08), 978 So.2d 325. This is because PCR creates the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. State v. Ellis, supra. A motion for new trial is also an acceptable vehicle by which to raise such a claim. State v. Williams, 33,581 (La.App.2d Cir.6/21/00), 764 So.2d 1164.. When the record is sufficient, the claim may be resolved on direct appeal in the interest of judicial economy. State v. Ratcliff, 416 So.2d 528 (La.1982); State v. Willars, 27,394 (La.App.2d Cir.9/27/95), 661 So.2d 673.
However, in extraordinary circumstances, appellate courts have taken a third approach on appeal and remanded an ineffective assistance claim for an eviden-tiary hearing. See State v. Brown, 48,257 (La.App.2d Cir.9/25/13), 135 So.3d 718, writ denied, 2013-2550 (La.4/4/14), 135 So.3d 640; State v. Taylor, 44,367 (La.App.2d Cir.9/23/09), 20 So.3d 1157; State v. Howard, 09-928 (La.App. 5th Cir.5/25/10), 37 So.3d 1099; State v. Lee, 2000-0183 (La.App. 1st Cir.2/16/01), 788 So.2d 452, writ denied, 788 So.2d 442 (La.2001).
| ¡An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.' La. C. Cr. P. art. 841. The contemporaneous objection rule prevents “a defendant from gambling for a favorable verdict and then, upon conviction, resorting to appeal on errors which either could have been avoided or corrected at the time or should have put an immediate halt to the proceedings.” State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996).
In State v. Arvie, 505 So.2d 44 (La.1987), the defendant’s failure to conterhporane-ciusly object to a Doyle violation resulted in the defendant’s conviction being upheld. However, the Louisiana Supreme Court stated that, if the defendant sought PCR and claimed that his previous counsel was ineffective because' counsel- failed to object to the prosecutor’s improper questions, the district court may take evidence, if necessary, and consider the failure under the standard of review for such claims enunciated in Strickland v. Washington, supra.
In some cases, defense counsel may be ineffective for “opening the door” to allow the prosecutor to take advantage of the defendant’s post-arrest, post-Miranda silence. When the record is sufficient, this issue may be resolved on direct appeal in the interest of judicial economy. State v. Washington, 46,265 (La.App.2d Cir.8/17/11), 72 So.3d 422.
JOTRAN SCRIPT EXCERPT
In this case, the defendant testified against the advice of his counsel. He denied committing the offenses or ever being at the Hall residence. On cross-examination, -the following' exchange occurred:
PROSECUTOR: You were arrested by Mr. Jeselink. Right?
MANSFIELD: Yes, sir.
PROSECUTOR: And he went over your rights with you. Right.
MANSFIELD: He did. Yes, sir.
[[Image here]]
PROSECUTOR: Okay. Is this your signature?[5]
MANSFIELD: Both of them. Yes, sir.
⅝ ⅜ ⅝
PROSECUTOR: You’ve had people go over this with you before.. Right?
MANSFIELD: Yes, sir, I have.
PROSECUTOR: At least five or six times according to the things you’ve *329 pled guilty to. And I know whenever you got that felony [they] went over your rights. Right?
MANSFIELD: Yes, sir.
PROSECUTOR: Now, one of the things they tell you is that you have a right to speak if you want to. Right?
MANSFIELD: Yes, sir.
PROSECUTOR: Why didn’t you tell him what you’re telling us now?
|,.MANSFIELD: Tell it — what am I telling you now? Let me know what I’m telling you.
PROSECUTOR: You ain’t telling me nothin’.
MANSFIELD: You toyin’— ' . '
PROSECUTOR: You are telling me and this jury what you want us to believe, but you had an opportunity, and correct. me if I’m wrong, you had an opportunity when you were arrested, you were read your rights, and you were given an opportunity to say anything you wanted to say. What did you say? ...
MANSFIELD: .[W]hen they read me my rights, they were trying to find out did I do this crime. , I’m like, what crime? I didn’t do it.
PROSECUTOR: You didn’t say ány-thing.-
MANSFIELD: I didn’t give no statement is what I’m saying.
PROSECUTOR: Exactly. You didn’t give a statement. You didn’t ... say I didn’t do it. What are you arresting me for? You didn’t say anything.
MANSFIELD: When they came to my house they was accusing me, asking me what I’m> doing around somebody’s house.. That’s what they.was sayin’, But what — I didn’t give no statement to the police officer at the office and what they sayin’ now, I mean, them two different things. I, mean its they word against my word. That’s so far what I see it. I mean, I don’t know, sir. I didn’t do it.
PROSECUTOR: So, Ms. Ida Hall who has never seen you before in her life. She’s lying.
* $ *
MANSFIELD: I would say yes, Ms. Ida Hall is lyin’.
PROSECUTOR: Okay. And also her daughter, Ms. Laura—
[[Image here]]
| ^MANSFIELD: .1 would say yes, Ms. Laura May is lyin’ too. ,
* . * *
PROSECUTOR: Okay, But this is your signature?
MANSFIELD: Yes, sir. ’
PROSECUTOR: And you did have an opportunity to talk with law enforcement, and you chose not to.
.MANSFIELD:'Yes, sir..
PROSECUTOR: Right?
MANSFIELD: Yes, sir.
PROSECUTOR: Okay. As a matter of fact, this is the first time you’ve ever said anything about it. Right?
MANSFIELD: I talked to the people . over there in the jail, but to you, yes, sir. ;
PROSECUTOR: You talked to people over there in the jail? ■'
MANSFIELD: Yes, sir.
PROSECUTOR: Told them you didn’t do it.
MANSFIELD:'Yes, sir.
PROSECUTOR: And they believe you.
MANSFIELD: They sort of like everybody else in here, got they own decisions.
*330 PROSECUTOR: Like the Shawshank Redemption. Ain’t nobody in jail guilty.
MANSFIELD: Shawshank Redemption. I ain’t never seen that movie, sir.
J^DISCUSSION
The record clearly shows that the prosecutor was attempting to impeach the defendant as a witness with his post-M-randa silence. Prior to questioning the defendant about his post-Miranda silence, the prosecutor had just finished going through the defendant’s extensive criminal history and the timing of the deféndant’s decision to cut his hair.
The state is allowed to reference the defendant’s post-Miranda ■ silence when it is relevant to rebut a defense-raised assertion that the arresting officers failed to properly investigate or that the defendant actively cooperated with the police when arrested. State v. Harrison, supra. Indeed, in this case, the prosecutor had earlier used the defendant’s post-Miranda silence to rebut defense counsel’s assertion that Det. Jeselink did not properly investigate the ownership of the blue hoodie. During Det. Jeselink’s cross-examination, defense counsel implied that Det. Jeselink failed to properly investigate the owner of the blue hoodie, because the defendant had not claimed ownership. The state rebutted this assertion by referencing the defendant's post-Miranda silence:
PROSECUTOR: You had an opportunity once you arrested Mr. Mansfield as everybody else, you give them a chance to read them their rights. Right?
DET, JESELINK: That is correct.
PROSECUTOR: And [defense counsel] is saying that Mr. Mansfield never said that that was [his] hoodie. Right?
DET. JESELINK: That’s correct.
|uPROSECUTOR; He "never said it wasn’t his either, did he?
DET. JESELINK: That is correct.
PROSECUTOR: As a matter of fact; he didn’t say anything, did he?
DET.-JESELINK: He did not say anything. No, sir.
The post-Miranda questions posed during the defendant’s.cross-examination had nothing to do with Det. Jesel-ink’s investigation, nor was it in response to the defendant claiming he cooperated with police. The prosecutor initiated the questions to illustrate to the jury that the defendant should have taken the opportunity to speak to the police if he didn’t commit the crimes. The defendant responded to one of the prosecutor’s questions by stating, “its [their] word against my word.” The prosecutor then asked the defendant if he thought Ms. Hall and Ms. May were lying. After the defendant stated that he did believe they were lying, the prosecutor asked the defendant again about his post-Miranda silence. Under the circumstances presented in this case, we find that the prosecutor’s actions constituted a Doyle violation. Having found a Doyle violation, we must now. consider whether it was harmless error by examining the evidence presented at trial in detail.
Ms. Hall testified that a teenage black male wearing a blue hoodie struck her with a pipe. Since the assailant was wearing the hood over the top of his "head, she could see only his face. Several days after the incident, she picked the defendant out of the four photos shown to her, and she identified the defendant as her assailant in court during the trial.
*331 |1fiOn direct examination, Ms. May testified that she did not witness the attack on her mother. Two days later, she saw a man on the train tracks near her mother’s house who “matched the description”.given by her mother. This man was wearing a blue hoodie and waved to her. She testified that she could not see the pants he was wearing because of the bushes on the tracks. She then testified that she saw the “man that attacked my mother” in the carport the following day and that he was the same person she saw on the train tracks. -She then admitted that she was too far away to see the facial features of the man on the train tracks and that she identified him by the hoodie only. She testified that the man she saw in the carport had unkempt hair and wore pants and a shirt. She stated that his hair was “this long,” while apparently indicating a length with her fingers. When she was shown the four photos by the police, tshe picked out the defendant’s photo as the man she saw in the carport. '
On cross-examination, she was questioned about the police report filed in connection with these events. The report stated that on the day that she saw the man on the tracks, she called back right away and said the man was under the porch. She testified that this statement was incorrect. The report further recounted that the man returned and banged on the door. She stated that this too was incorrect and that he never - came to the door and banged on it. She admitted that the person on the tracks was wearing a hoodie with the hood pulled up, so she could hot tell how long his hair was. The first time she saw the man face-to-face was in the carport, at a distance of about 10 feet. When she again stated that his hair was “this long,” | ^defense counsel questioned her further and successfully elicited a more precise'measurement of two inches long.
Det. Jéselink testified that he developed the defendant as a suspect and put together a photo “lineup,” from which both women identifiéd the defendant. The “lineup” found in the appellate record consists of four separate pages, each of which is entitled “Suspect Rap Slieet” and contains a photo' and personal information of a “suspect.” This information includes his name, address, date of birth, physical description (such as height, weight,’ skin tone,' body build, hair color and length, and eye color), and booking date. Our review of the photos shows that the men in the first three photos áre all of medium build, ranging in weight from 172 to 192 pounds and in height from 5'8"to 6'0"; these three men bear some resemblance to each other. The fourth photo is that of the defendant. It shows his build as “light” with weight of 135 pounds and height óf 5'7"; his facial features are significantly different from those of the other men, all of whom are more broad-faced. Each suspect was from the same geographical area. The detective testified that he had the women look through the pictures to see' if they recognized anybody.[6]
When Det. Jeselink arrested the defendant at his mother’s house, he seized-a blue hoodie, which Ms, Hall later identified as the one worn by her attacker. According to the detective, one of the women had stated that the man had a one-inch Afro haircut. At the time of his arrest, the defendant had no hair.
|170n cross-examination, the detective was confronted with several discrepancies in his police report. Although his report indicated that the “galvanized pipe used to *332 hit”- Ms. Hall was found and photographed,, he testified' that he never found the pipe. The report stated that the officer who responded to. Ms. May’s 911 call about the person, on the tracks went searching for a clean-shaven black male in his 20s, who was wearing a blue hoodie and blue jeans, and who had a one-inch Afro. However, according to the testimony given at trial, Ms. Hall saw only her assailant’s face because he wore his hood .over the top of his head; likewise,. Ms. May did hot "see the hair of the person on the track because his hood was pulled úp. The report also stated that Ms. May called back within minutes and said the man on the tracks came back and beat on the door, a contention which she refuted, in her trial testimony. When asked if it was customary for people to walk the train tracks, the detective conceded that he had personally seen several that did so.[7] .
Det. Jeselink also admitted that he built the lineup around the defendant’s appearance, not just the description given,by the women., He used only four photos; instead of the six or eight he sometimes used. H,e testified that he selected the other photos according to facial features, thinness, and hair length, and the fact that they all were from the Oollinston area. He admitted that the body builds of the other men included in the lineup did not match that of the defendant or the lack of facial hair described by Ms. May. As to the blue hoodie seized at the defendant’s 11sresidence, he conceded that the . word “Adidas” was displayed across the middle of it, and that neithér witness had mentioned this in her description' of the garment.[8]
Ms. May was recalled to the stand to clarify her prior testimony. She stated that she- called 911 on Tuesday and Wednesday, not twice on the same day. She admitted that she. could not- see the hair of the person on the tracks. However, she insisted'-that-the defendant was the man she saw in -the carport on Wednesday and that she was able to see his hair then because he was not-wearing a hoodie that day. She further conceded that she did not see the person who attacked her mother and that she could not say - that the person she saw in the carport on Wednesday was the same person she saw on the tracks on Tuesday.
The defendant’s mother and stepfather testified for the defense. The stepfather stated that the defendant kept his hair “brushed like waves.” The mother stated that at the time of his arrest he had his hah’ cut bald and that he always kept his hair “real short,”
The defendant testified that he did not have a one-inch hairstyle at the time of the offense and that he had trimmed-up facial hair. He denied ever being at Ms. Hall’s house or attacking her. On cross-examination, he said he cut his hair because he didn’t like it when it grew long and that he could “take the blame” for the blue hoodie.
h3In this case, the identity of the perpetrator was obviously the key issue. The instant. case is- more akin to the facts of State v. Patterson, supra, wherein the victim’s word was pitted against the defendant’s “with little or no corroboration on either side,” than to those of State v. Marshall, supra, with its “overwhelming” evidence of guilt in opposition to a “totally *333 implausible self-defense claim.” Unlike Marshall, we have no compelling forensic and physical evidence. Furthermore, we cannot ignore the fact that the jury, who viewed the witnesses and judged their credibility, acquitted the defendant of the battery charge despite Ms. Hall’s unequivocal identification of him as her assailant and the photos of her injuries. When looking at the totality of evidence presented by the state and the fact that the jury returned a “not guilty” verdict on the aggravated battery charge and a responsive verdict on the aggravated burglary charge, we simply cannot conclude that the Doyle violation was harmless.
Although ineffective assistance issues are generally deferred to PCR for a contradictory hearing under La. C. Cr. P. art. 930, we find that the evidence in this appellate record is sufficiently compelling to conclude that the interest of justice and judicial economy will be best served by remanding the matter for an evidentiary hearing at this juncture. In reaching this conclusion, we have considered several factors, including the length of these proceedings. The alleged offenses occurred in November 2010. The defendant was incarcerated approximately 34 months before his September 2013 trial, at which he was actually acquitted on one of the charges and convicted of only a, lesser included offense on the other charge. An out-of^time appeal was not .granted until May 2015, thus placing the matter before us in early 2016. We have also considered indications of other possible acts of ineffective assistance found in this record — i.e., appointed counsel’s failure to file a motion to suppress the warrantless seizure of the hoodie until jury selection had begun and his failure to file any motion to suppress the identification of the defendant in the unusual photo “lineup” procedure utilized in this case. Under the extraordinary facts of this case, we find that further delay in litigating the ineffective assistance issue is not warranted. At the hearing, evidence pertaining to trial counsel’s judgment, tactical decisions, and trial strategy will, of course, need tó be considered.
CONCLUSION
We remand the matter to the trial court for a contradictory hearing to fully litigate the ineffective assistance claim raised by the defendant.
REMANDED.

 Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

. The record indicates that the defendant and his mother lived in the 7000 block of Collin-ston Road while Ms.. Hall lived in the 7300 block.

. The date for the first two charges was November 21, 2010. No date was given for the last charge.

.On the second day of jury selection, defense - counsel filed a motion to suppress all evidence gathered during the "unreasonable search” of the defendant’s house and all statements made by the defendant before he was advised of his Miranda rights. The state objected to the motion as, untimely. The trial court agreed, and denied the motion shortly before opening statements were given,

. The prosecutor was apparently referring, to Mansfield’s signed Statement of Rights Form.

. The record demonstrates that defense counsel did not file a motion to suppress the Men-tification of the defendant in this unusual lineup procedure.

. Interestingly,, the report apparently indicated that the person who waved at Ms. May from the train tracks walked off, as opposed to running away.

. The hooded jacket admitted into evidence has the "Adidas” emblem, (the word "Adidas” with three slanted stripes in a triangle shape above it), backstitched in white, displayed prominently on the front of the jacket.