STEPHENS, J.
This criminal appeal arises from the Third Judicial District Court, Parish of Lincoln, State of Louisiana. The defendant, Dumauriea Leon McGee, was charged by grand jury indictment with second degree murder, in violation of La. R.S. 14:30.1. After a jury trial, McGee was found guilty as charged and sentenced to life imprisonment without the benefit of probation, parole, or suspension of sentence. No motion to reconsider sentence was filed. On appeal, among other assignments of error, McGee argues he received ineffective assistance of counsel at trial. For the following reasons, we remand this matter to the trial court with instructions for an evidentiary hearing on the issue of ineffective assistance of counsel.
FACTS
DeAnthony Mardis was shot and killed on May 30, 2013, in Ruston, Louisiana, while trying to purchase marijuana from McGee, who immediately fled the scene. McGee was arrested in Tallahassee, Florida by officers with the Tallahassee Police Department and was interviewed by Detective Craig Isom on June 3, 2013. United States Marshals transported McGee to Louisiana, where he was taken into custody by the Ruston Police Department on June 13, 2013. McGee was charged by grand jury indictment with the second degree murder of Mardis, and at arraignment McGee pled not guilty. McGee's trial commenced on January 9, 2017, at which he was represented by a court-appointed attorney. The jury was presented with the following testimony and evidence.
Officer Lloyd Anthony Pollard, who was employed by the Ruston Police Department on May 30, 2013, testified that he was dispatched to a house at 1307 Benton Street in Ruston shortly after 9:00 p.m. in response to a shooting. Upon arriving, Ofc. Pollard observed Mardis lying partially underneath a blue truck parked in the front yard of the residence. Emergency medical services ("EMS") and other officers were already at the scene and informed Ofc. Pollard that Mardis was still alive but had a weak pulse. In an effort to preserve the scene, Ofc. Pollard took photographs prior to EMS taking Mardis to the hospital. He also testified that he believed Mardis crawled under the vehicle in an attempt to hide from his shooter. Mardis was transported to a hospital where he later died.
Officer Gerald Jenkins of the Ruston Police Department was also dispatched to 1307 Benton Street and sketched the scene, documenting where the following evidence was recovered: a cigarette lighter, a cigarette butt, a digital scale, $11.00 in cash, three .38 caliber cartridges, a shoe impression, a machete, two Corona beer cartons (one of which contained marijuana), and two spent .38 caliber shell casings.
Officer Jenkins specifically noted that the digital scale was discovered in the *1144 ditch by Benton Street. The three live .38 caliber bullets were located near the truck, two on the opposite side of the truck from where Mardis's body was found and one near the rear of the truck. The two spent shell casings were located in the paved parking lot of the Royal Crest Apartment complex where McGee lived, which is next to the house at 1307 Benton Street. While examining the scene, Ofc. Jenkins noted that although there was a large bloodstain near the truck, it was unclear where Mardis began bleeding. Further, there were several shoe prints discovered on the truck's driver's side but none indicated there was a struggle. A machete was discovered in the bushes, but Ofc. Jenkins stated his opinion that it did not appear connected to the crime. The machete was not fingerprinted, nor did defense counsel request it be fingerprinted. A map of the crime scene entered into evidence at the trial indicates the machete was located separately from the marijuana found at the scene.
Patina Goldsmith testified that she was visiting her sister at 1307 Benton Street on the night of the shooting. Goldsmith heard gunshots around 9:00 p.m., went outside with her sister's boyfriend, Roderick Doss, and discovered Mardis lying underneath her sister's truck. Doss also testified and corroborated Goldsmith's version of events, adding that after the shooting, Doss looked out the window before going outside and observed McGee, whom Doss knew as "Cali," running toward the apartment complex. Doss did not see anything in McGee's hands. Doss identified McGee in open court as the man he saw running on the night of the shooting.
Robert Womack testified he discovered bullets and a rusty black gun several months after the shooting while visiting a friend who lives at 1305 Benton Street. The loaded gun was in some underbrush. Womack contacted the police, and Officer Harriet Sykes collected the gun, which was loaded. She brought the gun to the Ruston Police Department. Both Womack and Ofc. Sykes identified the gun in open court.
Mary Catherine Zoll, a chemist with the North Louisiana Crime Lab ("NLCL"), was accepted as an expert in forensic chemistry and testified that she performed a chemical analysis on the suspected marijuana (State's Exhibit Nos. 9 and 10) collected from the scene. Zoll confirmed at trial that the substance recovered was marijuana. Other expert testimony established that it is common for drug dealers to hide their merchandise, in packages similar to the Corona six-pack carton containing marijuana recovered from the crime scene.
Dr. Frank Peretti, an accepted expert in medicine with a specialty in forensic pathology, performed the autopsy on Mardis and testified that he was killed by two gunshot wounds, one in his upper left chest and the other in his mid-back. The first wound was a "through and through" and no bullet was recovered; however, Dr. Peretti was able to retrieve a bullet from the second wound. Both wounds appeared to be "distant gunshot wounds," which are injuries inflicted when the gun is two or more feet away from the target when fired. Mardis also had two abrasions on his upper left back and sand on his face and back. Mardis had marijuana, hydrocodone, and THC (tetrahydrocannabinol) in his system at the time of his death.
Troy Kendall Stracener, another analyst with the NLCL and accepted expert in forensic firearm identification, testified that the .38 caliber revolver found by Womack had its serial number filed off, and Stracener used chemicals to recover the number. Due to the rust inside the barrel of the revolver, which altered the unique grooves within the revolver's barrel, *1145 Stracener was not able to determine whether the bullet recovered from Mardis's body was fired from that particular revolver; however, Stracener noted that the bullet possessed the same class of characteristics as the referenced bullets fired during analysis. The two spent shell casings recovered from the scene were fired from the revolver. Finally, the bullets and shell casings recovered from the scene, including the one removed from Mardis's body, were all the same caliber, brand, size, and shape.
Nicholas Moore was a witness at the scene, and he testified to meeting with Mardis, Lamarro Moore, and Patrick Pringle at Lamarro's house on the night of the shooting at approximately 9:00 p.m. Pringle drove the four men to Benton Street and parked near the bushes located between the Royal Crest Apartments and the house at 1307 Benton Street. Mardis exited the vehicle. Nicholas saw Mardis meet with a person wearing a hood, whom Nicholas did not recognize. Mardis eventually returned to the vehicle, and Pringle drove them back to Lamarro's house. Nicholas did not exit the vehicle and could not recall whether anyone else did; however, Pringle drove the men back to Benton Street, where Mardis got out of the vehicle and met with the person a second time. Nicholas, Lamarro, and Pringle remained in the vehicle, while Mardis spoke with the person. Nicholas noted that Mardis and the person were out of his line of vision, but he suddenly heard what sounded like a fight. Mardis and the person appeared in the yard of 1307 Benton Street, where Nicholas saw the two men "swinging" at each other. Nicholas heard a gunshot. Mardis fell, and Nicholas heard a second gunshot-the shots were "seconds" apart-a very short time, Nicholas described. Nicholas fled the scene on foot and hid behind nearby houses.
Ultimately, Nicholas gave a statement to Ofc. Jenkins on June 3, 2013. Following the shooting but prior to giving his statement, Nicholas saw a television news report on the shooting, which identified McGee as a suspect. While giving his statement, Nicholas told Ofc. Jenkins that the man he saw in the news report, McGee, looked like the man who shot Mardis. Nicholas also stated that Mardis was unarmed when he exited Pringle's vehicle and did not have anything in his hands when he was shot.
Lamarro Moore was also in the vehicle when the crime occurred and testified that on the night of the shooting Pringle picked him up prior to 9:00 p.m. The pair drove to Mardis's house and collected Mardis. While driving back to Lamarro's house, Mardis stated that he wanted to buy some marijuana. Lamarro suggested a dealer, later identified as McGee, he had met through a friend and seen a few days before at an EZ Mart, where Lamarro got his cell phone number. Lamarro texted McGee, who instructed Lamarro, Pringle, and Mardis to meet him at Benton Street, behind the Royal Crest Apartments. Prior to meeting McGee, Nicholas joined them and the four drove to Benton Street. Arriving at the meeting place, Lamarro heard McGee and Mardis state that they did not have a scale to weigh the marijuana. Mardis got back into Pringle's vehicle, and he, Pringle, Lamarro, and Nicholas returned to Lamarro's house to get a scale.
Lamarro recounted that upon returning to Benton Street, Mardis got out of Pringle's vehicle while the others remained in the vehicle. Lamarro was seated in the front passenger's seat, the side closest to where Mardis and McGee were conducting their deal, when the shooting occurred-he had an unobstructed view. However, Lamarro also testified that he fell asleep for a *1146 few seconds, "because he was full of pills." He woke to the sound of an argument, and Lamarro heard Mardis ask, "[w]here the marijuana at?" Lamarro was about to get out of the vehicle to break up the fight when he claimed McGee shot Mardis. Like Nicholas, Lamarro stated that Mardis was unarmed when he left the vehicle and when he was shot. After Mardis was shot, Lamarro described how the victim attempted to crawl underneath the truck parked in the front yard of 1307 Benton Street, but McGee shot him a second time. Pringle called the police, and Lamarro exited the vehicle and fled the scene on foot. While fleeing, Lamarro saw McGee run toward the EZ Mart. Lamarro called the police and informed Ofc. Jennifer Windsor with the Ruston Police Department where McGee had fled. Lamarro later identified McGee as the shooter in the police station with a photographic lineup and again at trial.
Captain Eric Hanna led the investigation into Mardis's death and testified that he developed McGee as a suspect after Lamarro identified McGee as the shooter in a photographic lineup. Captain Hanna obtained an arrest warrant for McGee, but McGee fled Lincoln Parish before the warrant could be executed. He noted McGee was eventually apprehended in Florida on June 3, 2013, by the Tallahassee Police Department and transported back to Louisiana by United States Marshals. According to Cpt. Hanna, McGee was booked at the Lincoln Parish Detention Center on June 13, 2013, where he was fingerprinted. Captain Hanna executed a search warrant on McGee's apartment at the Royal Crest Apartments on June 11, 2013, which produced a digital scale used for weighing drugs and an empty Corona carton in the refrigerator. Captain Hanna also stated that he discovered a usable fingerprint on one of the beer bottles recovered from the crime scene, which was later identified by Lieutenant Owen McDonnell, an expert in latent fingerprint identification, as being McGee's fingerprint.
Following Lt. McDonnell's testimony, the state rested. The defense rested without calling any witnesses or admitting any evidence. After deliberation, the jury returned a verdict of guilty as charged for second degree murder, a violation of La. R.S. 14:30.1. McGee filed a motion for a new trial and for a post-verdict judgment of acquittal, both of which were denied. A presentence investigation report was ordered, and on March 9, 2017, McGee was sentenced to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. No motion to reconsider sentence was filed, and this appeal ensued.
DISCUSSION
On appeal, McGee brings three assignments of error. In his third assignment, McGee argues his trial counsel was ineffective and sets forth three specific instances in which trial counsel was deficient and those deficiencies prejudiced him. He submits his trial counsel failed: (1) to admit or proffer statements he made to Captain Eric Hanna and Detective Craig Isom; (2) to subpoena Detective Isom for trial; and, (3) to request that the machete (i.e., exculpatory evidence) found on the scene be fingerprinted.
Both the Louisiana and federal constitutions guarantee a criminal defendant's right to the assistance of counsel. Gideon v. Wainwright , 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) ; State v. Brooks , 452 So.2d 149 (La.1984). Typically, a defendant must show that his attorney's performance was deficient and that he was prejudiced by the deficiency. Strickland v. Washington , 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In some cases, however, *1147 a defendant is entitled to relief absent a showing of deficiency or prejudice. Those cases are limited to instances where a defendant is denied counsel at a critical stage of the proceedings, when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, and when the circumstances surrounding a trial prevent the defendant's attorney from rendering effective assistance of counsel. Bell v. Cone , 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) ; United States v. Cronic , 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).
We note that generally a claim of ineffective assistance of counsel is properly raised in an application for post-conviction relief ("PCR") in the trial court. This is because PCR creates the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. Nonetheless, when the record is sufficient, the claim may be resolved on direct appeal in the interest of judicial economy. State v. Ratcliff , 416 So.2d 528 (La. 1982) ; State v. Brown , 48,257 (La. App. 2d Cir. 9/25/13), 135 So.3d 718, 722, writ denied , 2013-2550 (La. 4/4/14), 135 So.3d 640. See State v. Revish , 2015-0470 (La. App. 1st Cir. 11/9/15), 185 So.3d 8, writ denied , 2015-2247 (La. 5/20/16), 191 So.3d 1066, where the appeal court addressed the merits of an ineffective assistance of counsel claim and concluded that the defendant's trial counsel's error in failing to object to an erroneous jury charge resulted in actual prejudice to the defendant and may have contributed to his convictions; thus it vacated the convictions and sentences and remanded for a new trial.
However, in instances where the record has been deemed insufficient to resolve the claim, the matter may be remanded to the district court for a full evidentiary hearing on the issue and a determination as to whether a defendant was entitled to a new trial. See State v. Addison , 1994-2745 (La. 6/23/95), 657 So.2d 974, 975 ("a showing by defendant at a subsequent hearing that his new attorney was totally unprepared may entitle him to a new trial"); State v. Mansfield , 50,426 (La. App. 2d Cir. 2/24/16), 190 So.3d 322, 333 ("[a]t the hearing, evidence pertaining to trial counsel's judgment, tactical decisions, and trial strategy will, of course, need to be considered"); State v. Taylor , 44,367 (La. App. 2d Cir. 9/23/09), 20 So.3d 1157, 1162 ("the record alone is inadequate to fairly resolve this issue"); State v. Lemon , 29,587 (La. App. 2d Cir. 8/20/97), 698 So.2d 1057, 1064 ("we remand the matter to the trial court for an evidentiary hearing on the issue of ineffectiveness of counsel"); State v. King , 2017-0126 (La. App. 4th Cir. 10/27/17), 231 So.3d 110, 123 ("resolution of this [ineffective assistance of counsel] dispute requires a more comprehensive record to evaluate the reasons and propriety of defense counsel's failure to lodge an objection to inadmissible hearsay statements").
At trial, although defense counsel asserted a claim of self-defense by McGee in his opening and closing statements, no mention was made of the State's possession of possibly exculpatory evidence gathered from the scene and in custody (i.e., a machete). Additionally, defense counsel failed to admit or proffer statements made to police which contained both exculpatory and/or inculpatory statements of McGee (i.e., regarding a machete). In light of the content of those statements, together with relevant evidence possessed by the State which had a direct connection to his claim of self-defense, we cannot possibly see, at least on this appeal record, how trial counsel's tactical decisions and/or trial strategy were such to further McGee's case. Resolution of this issue requires a more comprehensive record to evaluate the reasons *1148 and the propriety of defense counsel's failure to strenuously advance McGee's self-defense claims.
Here, we do not find the record is sufficient to resolve McGee's claim of ineffective counsel. As to his claim of ineffective assistance of counsel, we remand with instructions for the trial court to conduct a full evidentiary hearing, with benefit of counsel for McGee, and to render a ruling on the validity of the defendant's claim. In the event the trial court does find merit to this error, it should set aside the conviction and grant McGee a new trial. Also, because the issues in his remaining assignments of error are directly affected by the specific claims regarding the ineffective assistance of counsel, we pretermit those remaining assignments of error. Should the trial court not find ineffective assistance of counsel, McGee's right to seek a new appeal of that ruling is reserved as are the pretermitted assignments of error from this appeal.
REMANDED WITH INSTRUCTIONS.