GASKINS, J.
11Following a jury trial, the defendant, Derrick Dewayne Grant, was convicted of attempted second degree murder. He was adjudicated a fourth-felony offender. The trial court sentenced him to the mandatory term of life in prison without benefit of probation, parole, or suspension of sen-, fence. The defendant now appeals. We affirm the defendant’s conviction and sentence.
FACTS
On October 5, 2008, three men were playing dominoes on the front porch of a house on East 71st Street in Shreveport, Louisiana. An SUV stopped in front of the house. Two men armed with assault rifles exited the passenger side of the vehicle and opened fire at the men on the porch. One of the gunmen approached from a vacant lot beside the house while the other approached the front of the house.
One of the men on the porch, Michael Parker, sustained four gunshot wounds— two in the side and one in each leg. He survived the attack, although the doctors were unable to remove all of the bullets due to proximity to the victim’s heart. The other two men, Tawon Parker, the victim’s nephew, and Matthew Perry, the nephew’s cousin, were uninjured.
Scott Marler of the Shreveport Fire Department was driving east on East 70th Street near Thornhill when he heard loud popping noises and saw a tan SUV parked at the intersection of Thornhill and East 71st Street. Both doors on the passenger side were open, and two men were standing outside, firing weapons at a house. The weapons appeared to be long rifles or semi-automatic weapons. Marler turned his vehicle around and went after the lgSUV when it left the scene. He called 911 and reported the shooting and the SUV’s license plate number while following the vehicle onto 1-49 southbound. When Shreveport Police Officer John Stratton approached from oehind them in a marked patrol unit, Marler signaled him which vehicle to follow. Officer Stratton then took over the pursuit.
As Officer Stratton pursued the SUV, it began traveling at a high rate of speed and exited 1-49 onto the westbound Highway 3182 ramp. The officer’s dashboard-mounted video camera documented the high-speed chase. As Officer Stratton followed the SUV on the ramp, a backseat passenger in the SUV leaned out and pointed a long gun at the patrol unit. Officer Stratton heard a loud popping noise and saw something hit his windshield. The officer never stopped his pursuit, and never lost sight of the SUV, within which he clearly saw three black males.
The driver of the SUV lost control of his vehicle twice during the chase. Eventually the SUV stopped in a ditch on West 78th Street, and its occupants fled. According to the officer, all three of the men were armed with long rifles. The men fled on foot through a thicket of bamboo and over a fence that had razor wire on top. Other officers arrived on the scene very quickly and within a few minutes, the initial perimeter was set up and the search for the men began.
A K-9 unit began tracking the scent of the men and alerted to a house at 158 W. 79th Street under which an assault rifle was recovered. The K-9 unit then alerted more strongly to a house at 150 W. 79th where three black males were located. Another assault rifle was found under that house. The [sofficers conducted a knock and talk, encountering the defendant, William Hall, and Ira Ross. The defendant had a fresh cut on his face. The house *84 belonged to the defendant’s girlfriend, La-Sonya Hailey, but the defendant gave permission for a protective sweep of the home to be conducted. The sweep revealed muddy clothes and tennis shoes, some of which were in the process of being laundered at the time they were discovered. The men were arrested and advised of their Miranda rights.
All three men were charged with attempted second degree murder and tried separately.[1] Following a jury trial in June 2006, the defendant was convicted by a vote of 11 to 1. The state filed a habitual offender bill against the defendant. He was adjudicated a fourth-felony offender and sentenced to life in prison at hard labor without benefit of parole, probation or suspension of sentence. In October 2011, he was granted an out-of-time appeal.
BATSON CHALLENGES
In his first assignment of error, the defendant argues that the state systemi-eally struck African-American jurors from the jury venire in violation of the Equal Protection Clause of the 14th Amendment.

14Law

In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held that an equal protection violation occurs if a party exercises a peremptory challenge to exclude a prospective juror on the basis of a person’s race. The Supreme Court reaffirmed its position that racial discrimination in jury selection offends the Equal Protection Clause of the 14th Amendment in Miller-El v. Dretke, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). Louisiana law codifies the Bat-son ruling in La. C. Cr. P. art. 795.
The three-step Batson process was described in Rice v. Collins, 546 U.S. 333, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006), as follows:
A defendant’s Batson challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Internal quotations and citations omitted.]
The trial court’s responsibility when presented with a Batson challenge was detailed by the Louisiana Supreme Court in State v. Anderson, 2006-2987 (La.9/9/08), 996 So.2d 973, 1004, cert. denied, — U.S. *85 -, 129 S.Ct. 1906, 173 L.Ed.2d 1057 (2009):
|fiIf defendant makes a prima facie showing of discriminatory strikes, the burden shifts to the state to offer racially neutral explanations for the challenged members. If the race-neutral explanation is tendered, the trial court must decide, in step three of the Batson analysis, whether defendant has proven purposeful discrimination. The race-neutral explanation need not be persuasive or even plausible. It will be deemed race-neutral unless a discriminatory intent is inherent in the explanation. The ultimate burden of persuasion as to racial motivation rests with, and never shifts from, the opponent of the peremptory challenge.
The trial court’s findings with regard to a Batson challenge are entitled to great deference on appeal. When a defendant voices a Batson objection to the state’s exercise of a peremptory challenge, the finding of the absence of discriminatory intent depends upon whether the trial court finds the prosecutor’s race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor’s demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy. [Internal quotations and citations omitted.]
The trial court plays a unique role in the dynamics of voir dire, for it is the court that observes firsthand the demeanor of the attorneys and venire persons, the nuances of questions asked, the racial composition of the venire, and the general atmosphere of the voir dire that simply cannot be replicated from a cold transcript. See State v. Jones, 42,581 (La.App.2d Cir.11/7/07), 968 So.2d 1247.
Body language has been held to constitute a valid, race-neutral basis for defeating a Batson claim. State v. Coleman, 2006-0518 (La.11/2/07), 970 So.2d 511.

Discussion

The state utilized challenges against 11 African-American members of the jury pool. In response, the defense raised a Batson challenge. The Rtrial judge found that the defense had made a prima facie showing of discriminatory strikes and ruled that they should proceed to the second level of inquiry. The state then proceeded to place on the record race-neutral explanations for the strikes. After hearing the state’s explanations, the trial court denied the defense’s Batson motion. The record demonstrated that three of the jurors who served on the defendant’s jury were African-American, as was one alternate.
On appeal, the defendant argues that race-neutral reasons were not given for five prospective jurors: Brandi Hunter, Lekisha Cason, Louis Bonner, Jr., Felicia Smith, and Daniel Francis. He also complains that a bench conversation with Mr. Bonner was not transcribed.
The reasons given by the state for striking Ms. Hunter, Ms. Cason and Ms. Smith were essentially the same — that their responses and body language indicate that they favored defense counsel over the prosecutors. Mr. Bonner’s brother was a homicide victim and, as a result of how that criminal case was handled, Mr. Bonner felt mistreated. Mr. Francis had a cousin who was convicted of armed robbery and the assistant district attorneys trying this case were unsure as to whether they had prosecuted the cousin or whether Mr. Francis had resentment toward the state as a result of the conviction.
The trial court followed the three-step analytical process while deciding the Bat-son challenge. After finding the defense *86 had made a prima facie showing, the court required the state to articulate the basis for each peremptory exception. Although the defendant might have believed that the 17expIanations for striking Ms. Hunter, Ms. Cason, and Ms. Smith were too general, or unsatisfactory, the trial court was present to witness the demeanor of each juror while she answered the questions of the attorneys.[2] The trial court found the explanation for striking each of those jurors to be plausible, and found no discriminatory intent.
As to Mr. Bonner and Mr. Francis, the reasons given by the state were even more compelling. Even though the untran-scribed bench conversation with Mr. Bonner could not be reviewed, the prosecutor clearly articulated his reasoning, and it had nothing to do with race. From the context of the reasoning that was transcribed, it is apparent that Mr. Bonner’s brother had been murdered. The matter was discussed at the bench, and the prosecutor told the court, “[Mr. Bonner] made a statement at the bench that he had a problem with how he was treated. I just was simply unsure how that was going to come out.” The failure to record Mr. Bonner’s bench conference did not prejudice the appeal because the transcript of the voir dire revealed a substantial basis for challenging the juror. The fact, alone, that the bench conference was not transcribed is not grounds for finding error in the trial court’s refusal to find a Batson error, because the explanation given by the prosecutor, on its face, was race-neutral, and there is no need to have the transcript of the bench conference for that decision to be made.
As to Mr. Francis, the prosecutors indicated that they might have prosecuted the juror’s relative. That is a race-neutral reason.
|sThe reviewing court gives great deference to the trial judge’s evaluations of discriminatory intent, and should not reverse them unless they are clearly erroneous. In this case, there appears to be no abuse of discretion in the trial court’s decision to deny the Batson challenges.
This assignment of error lacks merit.
COMMENT ON DEFENDANT’S SILENCE
The defendant contends that the state committed reversible error in referring to his post-arrest silence and that his counsel was ineffective for failing to object to this error.

References to Sanders

At trial, the defendant took the witness stand in his own defense. During his testimony, he denied participating in the shooting with Ross and Hall and suggested that a man named Jackie Sanders — who was deceased at the time of trial — was the third man involved. He testified that he was at home watching television on the day of the offense when Ross and Hall came to the house he shared with his girlfriend. After he admitted them, Hall immediately began asking Ross where Jackie Sanders was, as if he expected Sanders to be coming in behind them. The defendant looked outside for Sanders but did not see him. He put the muddy clothes Hall and Ross were wearing in the washing machine and gave them other clothes to wear. After he saw the K-9 officer outside, he tried to clean up the mud in the bathroom where the washer was. When the police knocked, Hall an *87 swered the door. The defendant told the officers they could come in. His attorney asked him why he did that, and he answered:
|flBecause I just, I mean — I mean, how can you not tell the police? I mean, I didn’t — I mean, I had already told them from the jump when it come down, I mean, they — “All I can do is give /all some clothing when people come, you know. That’s on /all.” So, basically, I just told them of course they could come in, you know, and do a visual search or whatever they wanted to do. I let them in.
On cross-examination, the prosecutor asked the defendant:
Q. And with respect to this Jackie Sanders stuff going on, all that, the first time we’re hearing about it is here at your trial, right?
A. Yes, sir.
Q. Okay. And I believe you said that, “How can you not tell the police”— you know, talking about when the/re coming in. “How can you not tell them what’s going on” in response to one of your questions to [defense counsel]; do you recall saying that?
A. Yes, sir.
Q. Well, how come you didn’t tell the police about Jackie Sanders and all that at the time?
A. Because I hadn’t actually laid eyes on Jackie Sanders. I mean, I wasn’t going to tell the police that, “Hey, you got another guy next door.”
Q. Well, you didn’t tell the police anything, did you?
A. No, sir. All I told them is that they can search the house.
After the defendant’s testimony, the defense rested. During closing argument, the prosecutor addressed the issue of the defendant’s theory that Jackie Sanders was the third man at the crime scene and characterized the story as “the oldest defense in the world ... blame it on the dead guy. And I’m going to spring it on the jury on the day of trial.” The prosecutor said, | ](“That’s just stupid. That’s all that it is. And that’s exactly what they’ve given you.”

Discussion

Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), precludes the state from impeaching a defendant’s testimony at trial with evidence that he remained silent immediately after his arrest and after receiving the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The decision in Doyle rests on the premise that Miranda warnings render the subsequent silence of a defendant “insolubly ambiguous,” and thereby make later use of that silence to impeach his or her exculpatory testimony at trial fundamentally unfair. Doyle, 426 U.S. at 617-618, 96 S.Ct. 2240.
In Jenkins v. Anderson, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the court stated that while the Fifth Amendment prevents the prosecution from commenting on the silence of a defendant who asserts the right to remain silent during his criminal trial, it is not violated when a defendant who testifies in his own defense is impeached with his prior silence. Attempted impeachment on cross-examination of a defendant may enhance the reliability of the criminal process; use of such impeachment on cross-examination allows prosecutors to test the credibility of witnesses by asking them to explain prior inconsistent statements and acts. The Fifth Amendment, as applied to the states through the Fourteenth Amendment, is not violated by the use of pre-arrest silence to impeach a criminal defendant’s *88 credibility; impeachment follows the defendant’s own decision |nto cast aside his cloak of silence and advances the truth-finding function of the criminal trial. Common law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances from which that fact naturally would have been asserted.
In State v. Richards, 99-0067 (La.9/17/99), 750 So.2d 940, the court discussed the waiver principle inherent in a defendant’s choice to take the stand and testify on his own behalf. The court stated as follows:
Louisiana has long subscribed to the general waiver principle that by taking the stand at trial a defendant exposes himself to cross-examination on any relevant matter as any other witness. La. C.E. art. 611(B), cmt. (e) (“There is no intent to change the rule that a defendant who takes the witness stand in a criminal case is regarded as any other witness and is subject to examination on the whole case as was provided under former R.S. 15:462.”); State v. Shelby, 308 So.2d 279, 282-83 (La.1975); State v. Pellerin, 286 So.2d 639, 642 (La.1973). In this respect, Louisiana’s law adheres to federal law. See Mitchell v. United States, 526 U.S. 314, 319-21, 119 S.Ct. 1307, 1311-12, 143 L.Ed.2d 424 (1999) (“It is well established that a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details.... The privilege is waived for the matters to which the witness testifies, and the scope of the ‘waiver is determined by the scope of relevant cross-examination.’ ”) (quoting Brown v. United States, 356 U.S. 148, 154-155, 78 S.Ct. 622, 626, 2 L.Ed.2d 589 (1958)).
Louisiana has also followed common law tradition and allowed the substantive use of a defendant’s silence as a tacit admission under certain circumstances. State v. McClain, 254 La. 56, 222 So.2d 855, 857 (1969); State v. Carey, 628 So.2d 27, 32 (La.App. 2d Cir.1993) (on reh’g). At least as a general matter, this state has thus recognized that “aside from the privilege against compelled self-incrimination ... in proper circumstances silence in the face of accusation is a relevant fact not barred from evidence by the Due Process Clause.” Baxter v. Palmigiano, 425 U.S. 308, 319, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976). As with any other evidentiary question, the trial court retains the discretion to weigh the probative value of the defendant’s prearrest silence against its prejudicial impact. La. |12C.E. art., 403. In this case, however, defense counsel failed to provide any grounds for her objection to the prosecutor’s line of cross-examination, and she thereby precluded review of any basis for excluding evidence of the defendant’s prearrest silence. State v. Dupar, 353 So.2d 272, 273 (La.1977) (“An objection stating no basis presents nothing for this court to review.”); State v. Burnette, 337 So.2d 1096, 1100 (La.1976) (same). Richards, supra, 750 So.2d at 941-942.
A Doyle error is subject to a harmless error review. The harmless error inquiry is “whether the guilty verdict actually rendered in this trial was surely unattributable to the error.” A Doyle violation that is not harmless under this harmless error test constitutes reversible error. State v. Langston, 43,923 (La.App.2d Cir.2/25/09), 3 So.3d 707, writ denied, 2009-0696 (La.12/11/09), 23 So.3d 912.
The defendant put Jackie Sanders and his alleged role in the instant crime at issue in his opening statement, during his *89 questioning of state witnesses, and in his own testimony on direct examination by defense counsel. Based on the foregoing law, it was not reversible error for the prosecution to question the defendant, who took the stand in his own defense, about Sanders, and why the defendant did not tell the police about Sanders before his own arrest. The questions asked of the defendant addressed a time period pre-arrest, when the defendant allowed them to come in for a protective sweep. The questions do not imply that the prosecution is attempting to use the defendant’s post-arrest, post-Miranda, silence against him to infer guilt.
The defendant’s attorney raised the Sanders issue during the cross-examination of Hall, a prosecution witness who emphatically denied that Sanders had any involvement in the offense and who steadfastly identified 11sthe defendant as a participant in the shooting. Defense counsel also asked Tawon Parker questions about Sanders during cross-examination. Later, when the defendant took the stand, the state had the right to impeach the defendant’s testimony by bringing up the fact that the defendant had not mentioned Sanders when the police were conducting a knock-and-talk at the house, asking him what had happened.

Ineffective Assistance of Counsel

The defendant also argues that his Sixth Amendment right to effective assistance of counsel was violated because his attorney did not object to all of these violations of his rights as they were occurring during trial. He argues that his attorney did not object, move for a mistrial, or request an admonition regarding this line of questioning.
As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief (PCR) in the trial court than by appeal. This is because PCR creates the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. State ex rel. Bailey v. City of West Monroe, 418 So.2d 570 (La.1982); State v. Williams, 33,581 (La.App.2d Cir.6/21/00), 764 So.2d 1164. When the record is sufficient, this issue may be resolved on direct appeal in the interest of judicial economy. State v. Ratcliff, 416 So.2d 528 (La.1982); State v. Willars, 27,394 (La.App.2d Cir.9/27/95), 661 So.2d 673.
The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by the Sixth Amendment to the U.S. Constitution. State v. Wry, 591 So.2d 774 (La.App. 2d Cir.1991). A |14claim of ineffectiveness of counsel is analyzed under the two-prong test developed by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
To establish that his attorney was ineffective, the defendant first must show that counsel’s performance was deficient. This requires a showing that counsel made errors so serious that he was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment. The relevant inquiry is whether counsel’s representation fell below the standard of reasonableness and competency as required by prevailing professional standards demanded for attorneys in criminal cases. Strickland, supra. The assessment of an attorney’s performance requires his conduct to be evaluated from counsel’s perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel’s judgment, tactical decisions, and trial strategy, strongly presuming he has exercised reasonable professional judgment. State v. Moore, 575 So.2d 928 (La. App. 2d Cir.1991).
Second, the defendant must show that counsel’s deficient performance prejudiced *90 his defense. This element requires a showing that the errors were so serious as to deprive the defendant of a fair trial, i.e., a trial whose result is reliable. Strickland, supra. The defendant must prove actual prejudice before relief will be granted. It is not sufficient for the defendant to show the error had some conceivable effect on the outcome of the proceedings. Rather, he must show that, but for counsel’s unprofessional errors, there is a reasonable probability the outcome of the trial would have 11fibeen different. Strickland, supra; State v. Pratt, 26,862 (La.App.2d Cir.4/5/95), 658 So.2d 174, writ denied, 95-1398 (La.11/3/95), 662 So.2d 9. A defendant making a claim of ineffective assistance of counsel must identify certain acts or omissions by counsel which led to the claim; general statements and conclusory charges will not suffice. Strickland, supra; State v. Jordan, 35,643 (La.App.2d Cir.4/3/02), 813 So.2d 1123, writ denied, 2002-1570 (La.5/30/03), 845 So.2d 1067.
The record does not support a conclusion that the defendant received ineffective assistance of counsel as a result of the defense attorney’s failure to object to this line of questioning. The defendant chose to take the stand and mentioned Sanders himself; the state was then free to question him to impeach his testimony. Any objection by the defendant’s counsel to this line of questioning would have been overruled because it was not improper. Therefore, the defendant has failed to meet the Strickland test proving that counsel made errors so serious that he was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment. The attorney’s representation did not fall below the standard of reasonableness and competency required by prevailing professional standards demanded for attorneys in criminal cases.
Further, the defendant failed to show that counsel’s allegedly deficient performance prejudiced his defense. There was no showing of errors so serious as to deprive the defendant of a fair trial. The defendant did not prove actual prejudice, and failed to show that, but for his counsel’s | ^unprofessional errors, there was a reasonable probability the outcome of the trial would have been different.[3]
This assignment of error is without merit.
INSTRUCTION ON ACCOMPLICE TESTIMONY
The defendant contends that defense counsel should have requested a jury instruction advising the jurors to view the testimony of his alleged accomplice, William Hall, with caution. According to the defendant, trial counsel’s failure to seek such an instruction constituted ineffective assistance. We find that the record before us is sufficient to determine whether defense counsel’s performance was ineffective.

Hall’s Testimony

Hall testified at the defendant’s trial that he was the driver of the SUV and that the defendant and Ross were the shooters. According to Hall, their intended target was Tawon Parker, who had shot Ross the week before and stolen drugs from him which belonged to the defendant, a self-confessed drug dealer. Hall stated that the SUV was rented specifically for the *91 shooting through the defendant’s girlfriend. They planned to hide the vehicle after the shooting, then set fire to it and report it stolen. Hall testified that Ross was in the front passenger seat and the defendant was in the rear passenger seat. He identified the defendant as the SUV occupant who hung out the window and fired at the police during the subsequent | i7pursuit. According to Hall, the defendant received a laceration over his eye during their flight from the police when they climbed over a barbed wire fence and ran through bamboo after they ditched the SUV. Upon arriving at the defendant’s house, Hall testified that he had to kick the door in because they left the key in the SUV. They changed their clothes, which were muddy from their flight, and put them in the washing machine. Hall further testified that since their arrests, both Ross and the defendant told him to implicate Sanders instead of the defendant.

Law

In Louisiana, an accomplice is qualified to testify against a co-perpetrator even if the state offers him inducements to testify. The inducements would merely affect the witness’s credibility. State v. Hughes, 2005-0992 (La.11/29/06), 943 So.2d 1047. A conviction may be sustained by the uncorroborated testimony of an accomplice, although the jury should be instructed to treat the testimony with caution. State v. Hughes, supra; State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). When the accomplice’s testimony is materially corroborated by other evidence, such language is not required. State v. Hughes, supra; State v. Castleberry, 98-1388 (La.4/13/99), 758 So.2d 749, cert. denied, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999). An accomplice’s testimony is materially corroborated “if there is evidence that confirms material points in an accomplice’s tale, and confirms the defendant’s identity and some | ^relationship to the situation.” State v. Hughes, supra; State v. Castleberry, supra.
The testimony given by Hall regarding the identification of the defendant as a participant in the shooting is independently corroborated by the circumstantial evidence present in this case. Like Marler, the witness who observed the shooting, Hall placed the shooters as exiting the passenger side doors of the SUV to open fire on the men on the porch.' He also testified as to the procurement of the SUV by the defendant’s girlfriend, the defendant’s facial wound, the washing of the clothes, and the location of the recovered weapons.
Hall testified that he kicked in the back door to the defendant’s house because they left the key in the SUV and needed to enter quickly to elude the police. The defendant testified that when he was opening the door for Hall and Ross, Hall “[applied] a little, pressure to the back door” but that the door was not “busted.” The canine officer who approached the house observed that the door appeared to have been recently kicked in. While the police officer who followed the men during the car chase could not facially identify the defendant, he was able to say that he matched the qualities that he was able to observe.
While the defendant and his girlfriend testified as to innocent explanations for several portions of Hall’s testimony, they often ended up contradicting each other. Hall testified that the SUV was rented by the defendant’s girlfriend specifically for the shooting. The girlfriend testified that she rented it to go to Six Flags and visit family; however, the defendant 119testified that the SUV was not rented to go to Six Flags, which was closed, but to go to Trad *92 ers’ Village and buy some furniture and rims. As to the cut on the defendant’s face, Hall said it was received while they were jumping the fence during the flight from the police. According to Hall, the cut was bleeding hard at the defendant’s house and they tried to clean it up and stop the bleeding. Panicked, the three men decided that they would say the defendant received it in a fight with his girlfriend. While the defendant and his girlfriend testified she gave him the cut on his face by throwing a jar at him during a fight, they could not agree whether the fight was one or two nights before the shooting. The girlfriend was evasive when confronted with her statement to the police in which she stated that she only scratched the defendant during an argument. A police officer who searched the defendant’s house described the wound as fresh and untreated and said that he could tell blood had been wiped from it; he also observed that there was no scab or Band-Aid, as one might expect with an older wound.
We also note that on the issue of witness credibility, the trial court instructed the jury to consider the witnesses’ “interest or lack of interest in the outcome of the case; and the extent to which the testimony is supported or contradicted by other evidence.” The trial court further instructed the jury that the “testimony of a witness may be discredited by showing that the witness will benefit in some way by the defendant’s conviction or acquittal, that the witness is prejudiced, or that the witness has any other reason or motive for not telling the truth.” We find that, given the independent corroborating testimony, the trial court’s instruction provided sufficient | ¡^guidance to the jury for evaluating Hall’s testimony. See State v. Hughes, supra.
Under the facts presented here, the additional cautionary instruction on accomplice testimony was not warranted. As a result, we cannot say that defense counsel was ineffective for failing to request the jury instruction pertaining to accomplice testimony. There is no showing of deficiency in the defendant’s representation, much less deficiency prejudicing his defense as required under Strickland, supra.
This assignment of error lacks merit.
CONCLUSION
The defendant’s conviction and sentence are affirmed.
AFFIRMED.

. Ira Ross’ conviction for attempted second degree murder and sentence of 50 years at hard labor without benefits were affirmed in State v. Ross, 42,399 (La.App.2d Cir.8/29/07), 965 So.2d 610.
William Hall was also convicted of attempted second degree murder. A habitual offender bill was filed against him. However, he entered into an agreement with the state by which the habitual offender bill would be withdrawn and he would receive a sentence of 15 years at hard labor without benefits in exchange for his truthful testimony against the defendant in the instant trial.

. Interestingly, the trial court likewise denied the reverse-Batson challenge by the state when defense counsel gave similar reasons about rapport and feelings for the other side to explain his strikes against white prospective jurors.

. Even if the state’s reference to Sanders was a Doyle violation, we find that it was harmless error, given the strong direct and circumstantial evidence establishing the defendant’s guilt. Furthermore, we do not believe the lack of objection to the state’s mentions of Sanders would have constituted ineffective assistance of counsel under the facts of this case because it is unlikely that it would have changed the outcome of the trial.