STONE, J.
The defendant, Gregory Lynn Johnson, was convicted by a unanimous jury of second degree murder and sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. Johnson now appeals. For the following reasons, we affirm.
FACTS AND PROCEDURAL BACKGROUND
On June 27, 2013, officers with the Shreveport Police Department ("SPD") responded to a 911 call from a residence located at 609 Central Street in Shreveport, Louisiana. Officers found Walter Howard ("Walter") just inside the front door lying in a pool of blood with an apparent gunshot wound to the chest. Walter was transported to the hospital, where he was pronounced dead.
On August 15, 2013, Gregory Lynn Johnson ("Johnson") was indicted by a grand jury for the second degree murder of Walter. On November 3, 2016, a jury unanimously found Johnson guilty as charged. Johnson received the mandatory sentence of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. Johnson now appeals.
Appellate counsel argues there was insufficient evidence to support the conviction. Johnson filed a pro se brief arguing insufficiency of the evidence, as well as the violation of his Fifth Amendment right against self-incrimination and Sixth Amendment right to confront and cross-examine an adverse witness. Johnson also argues the trial court erred by lodging an incomplete appellate record.
*621 DISCUSSION
Sufficiency of the Evidence
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Tate, 2001-1658 (La. 05/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004) ; State v. Carter, 42,894 (La. App. 2 Cir. 01/09/08), 974 So.2d 181, writ denied, 2008-0499 (La. 11/14/08), 996 So.2d 1086 ; State v. Robinson , 50,643 (La. App. 2 Cir. 06/22/16), 197 So.3d 717, 719, writ denied , 2016-1479 (La. 05/19/17), 221 So.3d 78. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La. 02/22/06), 922 So.2d 517 ; State v. Dotie, 43,819 (La. App. 2 Cir. 01/14/09), 1 So.3d 833, writ denied, 2009-0310 (La. 11/06/09), 21 So.3d 297 ; State v. Robinson, supra .
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La. 1983) ; State v. Speed, 43,786 (La. App. 2 Cir. 01/14/09), 2 So.3d 582, writ denied, 2009-0372 (La. 11/06/09), 21 So.3d 299 ; State v. Robinson, supra .
Direct evidence provides proof of the existence of a fact, for example, a witness' testimony that he saw or heard something. State v. Lilly , 468 So.2d 1154 (La. 1985). Circumstantial evidence provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. Id . When the state relies on circumstantial evidence to establish the existence of an essential element of a crime, the court must assume every fact that the evidence tends to prove and the circumstantial evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438 ; State v. Lilly , supra ; State v. Robinson , 47,437 (La. App. 2 Cir. 11/14/12), 106 So.3d 1028, writ denied , 12-2658 (La. 05/17/13), 117 So.3d 918.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen , 36,180 (La. App. 2 Cir. 09/18/02), 828 So.2d 622, writs denied , 2002-2595 (La. 03/28/03), 840 So.2d 566, 2002-2997 (La. 06/27/03), 847 So.2d 1255, cert. denied , 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). The appellate court neither assesses the credibility of witnesses nor reweighs evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Eason , 43,788 (La. App. 2 Cir. 02/25/09), 3 So.3d 685, writ denied, 09-0725 (La. 12/11/09), 23 So.3d 913 ; State v. Hill , 42,025 (La. App. 2 Cir. 05/09/07), 956 So.2d 758, writ denied, 07-1209 (La. 12/14/07), 970 So.2d 529.
*622 When a jury reasonably and rationally rejects the exculpatory hypothesis of innocence offered by a defendant's own testimony, an appellate court's task in reviewing the sufficiency of the evidence under the Due Process Clause is at an end unless an alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Calloway , 2007-2306 (La. 01/21/09), 1 So.3d 417 ; State v. Matthews , 50,838 (La. App. 2 Cir. 08/10/16), 200 So.3d 895 ; State v. Walker , 51,217 (La. App. 2 Cir. 05/17/17), 221 So.3d 951.
Second degree murder is defined by La. R.S. 14:30.1, in pertinent part, as the "killing of a human being" when the offender has "a specific intent to kill or to inflict great bodily harm." Specific intent is the state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). As a state of mind, specific intent need not be proved as a fact; it may be inferred from the circumstances and the actions of the defendant. State v. Kahey , 436 So.2d 475 (La. 1983) ; State v. Lensey , 50,242 (La. App. 2 Cir. 11/18/15), 182 So.3d 1059, 1062, writ denied , 2015-2344 (La. 03/14/16), 189 So.3d 1066. The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. State v. Lloyd , 48,914 (La. App. 2 Cir. 01/14/15), 161 So.3d 879, writ denied , 15-0307 (La. 11/30/15), 184 So.3d 33. The determination of whether the requisite intent is present is a question for the trier of fact. State v. Huizar , 414 So.2d 741 (La. 1982) ; State v. Lloyd, supra.
At Johnson's trial, the state presented the jury with the following evidence and testimony. Katrina Sims ("Sims") testified that, on June 27, 2013, she made the initial 911 call to report witnessing Walter being shot by a man named "Greg." Sims testified she was in a relationship with Walter's brother, Johnny Howard ("Johnny"), and had been staying at the brothers' residence at 609 Central Street for a couple of months prior to the shooting. Sims testified she was aware that Walter made his living selling drugs and admitted to being a drug user herself. Sims professed to using drugs on the day of the shooting but claimed she was still in her "right mind" and able to "see things clearly."
Sims testified that on June 27, 2013, between 2:00 and 3:00 a.m., she was dropped off at 609 Central Street by a friend. As Sims walked up to the house, she saw Johnson standing on the front porch of the house talking to Walter, who was standing inside the house between an opened wooden door and a locked screen door with burglar bars. Sims greeted Johnson as she walked up to the porch. Sims had known Johnson for about a year from the neighborhood, and they had previously done drugs together. Walter opened the screen door for Sims and locked it after she entered the house. Sims stated Walter usually made drug deals through the locked screen door.
Upon entering the house, Sims testified she overheard the men arguing over a drug transaction. Johnson said, "Man, you going to have to do better than this, man, hey, man, what is this." Walter responded, "Man, just fuck it, give me my shit, man, I got to get up early in the morning, man, I got to go to Kansas City, I got to go out of town, so give me my shit." Sims testified she saw Walter open the door and Johnson place three packages of "rock" into Walter's hands. Thereafter, the men started "tussling." Sims described Walter as the bigger man in stature and strength compared to Johnson. Sims testified she did *623 not initially see a gun but subsequently saw Johnson produce a silver pistol. Sims did not see Walter with a weapon.
Sims stated when Walter saw the gun, he grabbed the wooden door and pushed it shut. As Walter leaned against the door to hold it shut, Sims testified that she heard several gun shots. She also heard Walter moaning. After witnessing the shooting, Sims said she ran to the back of the house and hid under a bed. While under the bed, Sims called 911 to report the shooting and named Johnson as the shooter. The 911 call was played for the jury. Sims testified the person she identified as the shooter in the 911 call was the same person sitting in the courtroom, Johnson. Once officers arrived at the scene, Sims spoke with SPD Officer Zachary Johnson ("Officer Johnson"), whom she knew from the neighborhood. Sims testified she told Officer Johnson that "Greg just shot Walter." In an interview conducted by SPD Detective Joshua Mayfield ("Detective Mayfield") at the police station, Sims stated she witnessed Johnson shoot Walter. She also identified Johnson as the shooter in a photographic lineup.
Johnny, Walter's older brother, testified that on the morning of the shooting, he was awakened by Johnson knocking on his bedroom window looking for Walter. He had known Johnson for several years. Johnny testified he told Johnson that Walter was asleep. Johnson then told Johnny to wake up Walter because he had "$50 for him." After waking Walter up, Johnny testified he saw Walter walk to the front door where Johnson was standing. Soon after returning to bed, Johnny heard "squabbling" between Walter and Johnson and then gun shots. Upon hearing the gun shots, Johnny got out of bed and crawled down the hallway toward the front door. Johnny found Walter lying down and saying, "I've been shot, man. He shot me." Johnny immediately called 911. Like Sims, Johnny went to the police station to give a statement and identified Johnson in a photographic line-up as the last person he saw talking to Walter.
During cross-examination, Johnny admitted to talking with Michael Holmes ("Holmes"), the defense's private investigator, and stating Sims was not in the house when Walter was shot. However, Johnny testified he later learned he was mistaken and Sims was in the house during the shooting. Johnny testified he went back to bed after Walter went to the front door and would not have known if Sims subsequently entered the house. Johnny explained there were multiple people at the residence on the morning of the shooting because they were all traveling later that day to a family reunion in Kansas City.
Corporal Johnson testified he responded to a report of a shooting at 609 Central Street on June 27, 2013. Corporal Johnson grew up in the same neighborhood as Walter and Johnson and had known them since he was a child. Upon arriving at the scene, Corporal Johnson stated he was approached by a hysterical Sims who told him "Greg just shot Walter." Corporal Johnson knew she was referring to Greg Johnson, who he encountered less than a block away from Walter's residence the night prior to the shooting. After speaking with Sims, Corporal Johnson stated he and several other officers left the scene to locate Johnson at his residence, which was in close proximity to Walter's residence. However, they were unsuccessful in locating him.
Justin Glover ("Glover") became a witness following a letter he wrote from jail to the Caddo Parish District Attorney in 2013 about his knowledge of the shooting. Glover testified he knew both Walter and Johnson, and had visited with Johnson at *624 his house prior to the shooting. Glover testified he left Johnson's house with him and witnessed Johnson walking in the direction of Central Street where Walter lived. Later that day, Glover encountered Corporal Johnson who stated they were looking for Johnson because he had killed Walter. Thereafter, Glover testified he met with Johnson again in Johnson's yard. According to Glover, Johnson was accompanied by two young men, and they all had guns. Glover testified he informed Johnson that Corporal Johnson was looking for him, and Johnson responded by telling everyone to leave. Glover saw Johnson give his gun to one of the young men and ask the young man to put the guns in a ditch near Johnson's house. Glover testified Johnson then told him that he thought he killed Walter.
SPD Corporal Erick Ardoin ("Corporal Ardoin") was involved in the apprehension of Johnson hours after the shooting. Corporal Ardoin testified that, on the day of the shooting, he received a call from a confidential source that Johnson was located at 1543 Hollywood Avenue. Armed with a warrant to arrest Johnson, Corporal Ardoin testified that a team of officers surrounded the house and obtained permission from an occupant to enter. Corporal Ardoin, along with other officers, entered the house looking for Johnson. Corporal Ardoin stated they eventually found Johnson hiding in a closet. After a brief struggle, Corporal Ardoin was able to arrest Johnson and bring him into custody.
Detective Mayfield was the homicide detective on the case. Detective Mayfield, along with SPD Sergeant Eric Farquhar ("Sergeant Farquhar"), examined the crime scene and identified six shell casings near the location where the shots were fired. During his testimony, Sergeant Farquhar identified photographs of the evidence found at the scene, including shell casings, bullet markings and trajectory, and blood-splattered magazines and a $100 bill near the front door.[1]
Dr. Long Jin ("Dr. Jin") was stipulated as an expert in the area of forensic pathology. Dr. Jin conducted Walter's autopsy and determined the cause of death was a gunshot wound to the left chest. Dr. Jin concluded the manner of death was a homicide. Carla White ("White"), a firearms expert with the North Louisiana Crime Lab in Shreveport, testified she examined six fired 9mm shell casings from the scene of the shooting, a bullet from the scene, and the bullet taken from Walter's body. Based on her examination, White concluded the six shell casings were all fired from one weapon and the two bullets were both fired from one weapon.[2] After learning the shell casings found at the scene came from the same gun, Detective Mayfield concluded it was unlikely there was more than one shooter.
Detective Mayfield testified he interviewed Sims and Johnny after the shooting and corroborated their trial testimony. Detective Mayfield testified Sims identified Johnson as the shooter and Johnny identified Johnson as the man at the house looking for Walter minutes before the shooting. Additionally, Detective Mayfield testified he interviewed Glover in 2015 about the letter he wrote to the district *625 attorney. Detective Mayfield corroborated Glover's trial testimony, and stated he searched the ditch by Johnson's house but did not recover anything. Since it had been a couple of years since the shooting, Detective Mayfield testified he did not expect to recover any physical evidence from the ditch. He also tried to track down the two young men that Glover stated were with Johnson. However, Glover did not know their names, and Detective Mayfield was unable to determine their identities.
On cross-examination, the defense pointed out Glover stated in his letter that Johnson was not the person who shot Walter. However, Detective Mayfield responded Glover was not at Walter's home at the time of the shooting, and thus, could not have firsthand knowledge of who actually killed Walter. Moreover, during Glover's cross-examination, Glover stated he did not believe Johnson was the shooter, because the two young men Johnson was with that morning "had a reputation for doing things like that" and "Greg ain't never had a reputation like that." Glover reiterated that he saw Johnson with a gun after the shooting and that Johnson stated he thought he killed Walter.
After the state rested its case, the defense presented the testimony of Holmes. The private investigator testified he interviewed Johnny, on or about August 12, 2016. A recording of the interview was played for the jury. In the interview, Holmes testified Johnny told him that Sims was not in the house at the time of the shooting and that he only saw Sims after the shooting. On cross-examination, Holmes admitted he did not ask Johnny any follow-up questions, such as how many people were in the house, if he had searched any of the rooms to locate Sims, or whether Sims had made a 911 call immediately after the shooting.
The defense next presented the testimony of Johnson's wife, Betty Johnson ("Betty"). At the time of the shooting, Betty was living in Savannah, Georgia. Betty testified she had never known Johnson to own a weapon, she forbade him from having a weapon in the house, and she had no reason to believe he had a weapon on the day of the shooting. On cross-examination, Betty admitted she had no firsthand knowledge of whether or not Johnson had a weapon on the day of the shooting.
Johnson elected to testify on his behalf. On the morning of the shooting, Johnson testified he was walking on Central Street, near Walter's house, when he saw a car pull up and a man and a woman get out of the car. The occupants of the car were standing in Walter's yard when Johnson approached the house. Johnson saw the woman enter the house and noticed the man was still in the yard standing at the corner of the house. Johnson testified he stepped onto the porch and rang the doorbell, noticing that the door to the house was slightly ajar. According to Johnson, Walter came to the door and asked him what he needed. Johnson told Walter that he had a $100 bill. Johnson testified he put the $100 bill on the door and Walter "went to peeling off some-some drugs."
Johnson testified he told Walter someone was standing at the end of his house, and Walter told him not to worry about it because the man was with the woman. Johnson stated he got his drugs and left. While walking down the street away from the house, Johnson said he heard gun shots and ran to an apartment complex nearby and "hit a piece of the drug." Thereafter, Johnson stated he saw the same car that had dropped the woman off at Walter's house "coming off Central Street." Johnson testified he knew Sims but did not see or speak to her on the morning of the shooting. Johnson admitted *626 he did not see the face of the woman who got out of the car but that the woman could have been Sims.
Johnson also denied seeing Glover or having a gun on the day of the shooting. Johnson said he did have a conversation with Glover after the shooting while they were imprisoned together. Johnson denied concealing a weapon, hiding a weapon in a ditch, or having anyone else hide a weapon in a ditch. The week of the shooting, Johnson testified he found out he had an arrest warrant for failing to register as a sex offender. Johnson stated he hid after the shooting because he heard sirens nearby and did not want to go to jail for his failure to register as a sex offender.
After a thorough review of the record, we find the evidence presented at trial was sufficient to convict Johnson of the second degree murder of Walter. The evidence shows Walter was shot in the chest while inside the door of his home. The evidence placed Johnson outside the door of the home at the time of the shooting. The evidence established Walter was a drug dealer and Johnson was a known drug user. Sims testified she arrived at the home while Walter was executing a drug transaction with Johnson from inside the door. She stated the men began arguing and Johnson attempted to enter the home armed with a pistol. Sims testified Walter tried to close the door on Johnson by leaning his weight against the door but shots rang out and Walter dropped to the floor. Sims identified Johnson numerous times as the shooter.
The physical evidence presented by the state supported Sims' testimony. At least six 9mm shell casings, fired from the same gun, were found at the crime scene. Three shell casings were found on the front porch by the door where Johnson was seen immediately before the shooting. The physical evidence demonstrated that the 9mm bullets penetrated the door at a trajectory that would likely hit a person on the other side of it. The forensic evidence revealed Walter was killed by a 9mm bullet to the chest.
While Johnson argues Sims' testimony is unreliable because she was using drugs on the day of the shooting, it is not the duty of this court to assess Sims' credibility. Sims stated she was in her "right mind" at the time of the shooting, and the jury's decision to accept her testimony is entitled to great deference. Eason, supra . Furthermore, the majority of Sims' testimony was corroborated by other witnesses. Johnny placed Johnson on the front porch of the house, with Walter standing on the other side of the door, inside the home. Johnny testified that, while in bed, he heard the men arguing immediately before hearing gun shots. Thereafter, Johnny saw Walter lying on the ground near the front door saying the words, "he shot me." Additionally, Glover testified he saw Johnson after the shooting with a gun and that Johnson stated he thought he killed Walter.
In his pro se brief, Johnson asserts all the witness testimony presented by the state was impeached and therefore, standing alone, could not be used to support his conviction. However, Johnson fails to identify any specific witness testimony that was allegedly impeached. The jury clearly found the witness testimony credible and Johnson's exculpatory hypothesis of innocence unpersuasive. Furthermore, the state presented adequate physical evidence to support the witness testimony. Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found Johnson had the specific intent to kill or inflict great bodily harm to Walter on the morning of June 27, 2013. Accordingly, the jury's decision will not be disturbed on appeal.
*627 Doyle Violation
In Doyle v. Ohio , 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the United States Supreme Court held that the use for impeachment purposes of the defendant's silence at the time of arrest and after receiving Miranda warnings violates the Due Process Clause of the Fourteenth Amendment. The decision in Doyle rests on the premise that Miranda warnings render the subsequent silence of the defendant "insolubly ambiguous," and thereby make later use of that silence to impeach his or her exculpatory testimony at trial fundamentally unfair. State v. Richards , 99-0067 (La. 09/17/99), 750 So.2d 940 ; State v. Grant , 47,365 (La. App. 2 Cir. 09/20/12), 105 So.3d 81, writ denied , 2012-2279 (La. 04/05/13), 110 So.3d 1073 ; State v. Mansfield , 50,426 (La. App. 2 Cir. 02/24/16), 190 So.3d 322, 326.
A defendant's due process rights are violated when a prosecutor impeaches a defendant's exculpatory story, told for the first time at trial, by cross-examining him about his failure to have told the story after receiving Miranda warnings at the time of his arrest. State v. Marshall , 2013-2007 (La. 12/09/14), 157 So.3d 563.
The Doyle proscription against referring to a defendant's post-arrest silence is not without exceptions. The state is allowed to reference the defendant's post-arrest silence when the evidence of post-arrest silence is relevant to rebut a defense-raised assertion that the arresting officers failed to properly investigate or that the defendant actively cooperated with the police when arrested. State v. Bell , 446 So.2d 1191 (La. 1984) ; State v. Harrison , 46,325 (La. App. 2 Cir. 05/18/11), 69 So.3d 581 ; State v. Mansfield, supra.
A Doyle violation is characterized as a trial error which is subject to a harmless error analysis. The harmless error inquiry is "whether the guilty verdict actually rendered in this trial was surely unattributable to the error." State v. Marshall, supra ; State v. Harrison, supra ; State v. Mansfield, supra . A Doyle violation that is not harmless under this harmless error test constitutes reversible error. State v. Mansfield, supra.
After Johnson was arrested and brought to the police station, Detective Mayfield testified he advised Johnson of his rights and Johnson signed a rights form. A copy of the rights form was admitted into evidence over defense counsel's objection. At the police station, Detective Mayfield testified he made a reference to Johnson about knowing Walter and the Howard family for about 20 years, and Johnson voluntarily commented he had known them "his whole life."
At trial, defense counsel claimed Johnson's Fifth Amendment right was violated by the admission of Johnson's rights form that stated "asked for a lawyer." According to defense counsel, the admission of the rights form placed in front of the jury the fact that Johnson refused to talk to police. In his pro se brief, Johnson contends the state elicited police officer testimony of his post-Miranda silence to infer guilt in violation of Doyle. We disagree.
A Doyle violation occurs when the state uses a defendant's post-Miranda silence to impeach his exculpatory testimony. However, Johnson testified at trial and was never questioned about his post-Miranda silence. Furthermore, it is reasonable to conclude the state admitted Johnson's rights form to show Johnson provided the comment voluntarily and not as evidence against him. At trial, Detective Mayfield never discussed whether Johnson waived his rights, or otherwise invoked his right to remain silent. Detective *628 Mayfield only referenced a voluntary, post-Miranda statement provided by Johnson, which is not a Doyle violation.
Nonetheless, even if Detective Mayfield's testimony and the admission of the rights form was a Doyle violation, it is harmless error. As stated above, the corroborated testimony of Sims, along with the physical evidence, was sufficient to support Johnson's conviction.
Confrontation Clause Violation
In his pro se brief, Johnson argues the trial court violated his Sixth Amendment right to confront and cross-examine Corporal Ardoin, a witness against him. During Corporal Ardoin's direct examination, he testified that Johnson attempted to evade arrest by hiding in someone else's home. Once Johnson was found, Corporal Ardoin testified he struggled with Johnson, who was uncooperative and resisted arrest. On cross-examination, defense counsel attempted to show that, at the time of his arrest, Johnson had two outstanding warrants, one being for his failure to register as a sex offender. The state objected on the basis that defense counsel was soliciting potential La. C. E. art. 404(B) information which was not related to the case and the admission of which might cause a mistrial. The trial court sustained the objection.
Johnson claims he evaded and resisted arrest because of the arrest warrant for failure to register as a sex offender, which predated the arrest warrant for Walter's murder. Johnson argues evidence regarding the arrest warrant for failure to register as a sex offender was relevant in light of the following jury instruction requested by the state: "Evidence of flight, concealment, and attempt to avoid apprehension is relevant. It indicates consciousness of guilt and, therefore, is one of the circumstances from which the jury may infer guilt." Johnson contends the trial court erred by sustaining the state's objection and preventing defense counsel from cross-examining Corporal Ardoin about Johnson's previous warrant.
The Confrontation Clause of the Sixth Amendment provides that in "all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." Crawford v. Washington , 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The Sixth Amendment safeguards the defendant's right to confront his accusers and to subject their testimony to rigorous testing in an adversary proceeding before the trier of fact. California v. Green , 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) ; State v. Dukes , 46,029 (La. App. 2 Cir. 01/26/11), 57 So.3d 489, writ denied , 11-0443 (La. 03/02/12), 83 So.3d 1033.
Confrontation errors are subject to a harmless error analysis. See Delaware v. Van Arsdall , 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) ; State v. Robinson , 01-0273 (La. 05/17/02), 817 So.2d 1131 ; State v. Cope , 48,739 (La. App. 2 Cir. 04/09/14), 137 So.3d 151, writ denied , 14-1008 (La. 12/08/14), 153 So.3d 440 ("The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt."). Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's *629 case. Delaware v. Van Arsdall, supra ; State v. Cope, supra .
The trial court erred by not allowing defense counsel to cross-examine Corporal Ardoin about his knowledge of Johnson's previous arrest warrant. The information would have supported Johnson's assertion that he avoided arrest for failing to register as a sex offender and not because he killed Walter. Nevertheless, the error was harmless. Johnson was allowed to testify that he avoided arrest because of the previous arrest warrant, and absent Corporal Ardoin's testimony, the evidence was sufficient to support Johnson's conviction.
Designation of the Record
In his pro se brief, Johnson asserts the appellate record does not contain a transcript of voir dire, opening statements, closing arguments, and all bench conferences. Johnson contends he could not thoroughly prepare his appeal without the missing transcripts.
In a motion for appeal and designation of the record granted by the trial court, Johnson's counsel requested the inclusion of "the entire transcript of the trial" in the appellate record. In preparation of filing a pro se brief, Johnson timely requested a copy of the appellate record, which was shipped to him. Soon after, Johnson filed a motion to supplement that appellate record with the missing transcripts, noting his counsel had requested the "entire transcript." In his motion, Johnson argued there are issues which must be addressed on appeal, "as there were objections lodged during the course of jury selection, or in the alternative, defense counsel should have objected to errors." This court denied Johnson's motion to supplement.
A slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal does not cause reversal of a defendant's conviction. State v. Magee , 2011-0574 (La. 09/28/12), 103 So.3d 285, 335 ; State v. Hollins , 2011-1435 (La. App. 4 Cir. 08/29/13), 123 So.3d 840, 873, writ denied , 2013-2555 (La. 04/25/14), 138 So.3d 642. An incomplete record may be adequate for appellate review. State v. Castleberry, 98-1388 (La. 04/13/99), 758 So.2d 749, 773 ; State v. Hollins, supra. Absent a showing of prejudice based on the missing portions of the transcripts, a defendant is not entitled to relief on the basis of an incomplete record. State v. Castleberry, supra ; State v. Hollins, supra.
We find the record was adequate for appellate review. Johnson failed to specify any errors which occurred during voir dire, openings statements, closing arguments, or the bench conferences, and the record does not indicate defense counsel made any objections during those proceedings. Consequently, we cannot find Johnson was prejudiced by the missing transcripts.
CONCLUSION
For the foregoing reasons, Gregory Lynn Johnson's conviction and sentence are affirmed.
AFFIRMED.

Sergeant Farquhar also identified a photograph of a piece of paper that had the name "Greg" on it with a phone number. Detective Mayfield called the phone number on the paper and learned that the number belonged to another Greg that worked at a lawnmower shop.

White concluded that all the shell casings and bullets were definitely 9mm. However, she testified that, without the handgun, she could not determine if the bullets and shell casings were fired from the same gun.